HUSAR INDUSTRIES, INC., Appellant,

v.

A.L. HUBER & SON, INC., Respondent.

No. WD 34538.

Missouri Court of Appeals,
Western District.

May 22, 1984.

As Modified July 31, 1984.

Application to Transfer Denied
Sept. 11, 1984.

Michael W. Manners of Paden, Welch, Martin, Albano & Graeff, P.C., Independence and H. Kent Desselle of Desselle, White, Allinder & Grate, Independence, for appellant Husar Industries, Inc.

Larry E. Butcher, Cameron and Michael W. Thompson of Mitchell, Kristl & Lieber, Kansas City, for respondent A.L. Huber & Son, Inc.

Before LOWENSTEIN, P.J., and MANFORD and BERREY, JJ.

MANFORD, Judge.

This civil action seeks recovery of monies arising from the construction of a building. The judgment is affirmed.

Before setting forth the pertinent facts and the charged errors, it is necessary, for purposes of clarity, to identify the respective parties, plus to briefly outline the manner in which this case developed procedurally.

This case commenced as an action to enforce a mechanic's lien by Manuel Morris, the original architect, against Nick Husar, Husar Industries, Inc., Goppert Bank (mortgagee), and The Land Clearance for Redevelopment Authority of Kansas City, landowner. A.L. Huber & Son, Inc. subsequently secured leave to become a party defendant. Huber then cross-claimed against all other parties, claiming a mechanic's lien and asking for enforcement of its alleged lien against the property. In addition, Huber sought recovery against Husar in two separate claims of an account and quantum meruit. By amended answer, Husar then filed a counterclaim against Morris for design defects in the building and cross-claimed against Huber for failing to construct the building in a workmanlike manner in accordance with the contract between Husar and Huber.

Just prior to trial, Morris and Husar settled the claims between them. At the same time, the trial court ordered a separate trial on the mechanic's lien claim of Huber. This case then became a matter of the contract claims and the quantum meruit claim as between Huber and Husar. In addition, just prior to trial, Husar, as an individual, was dismissed by the trial court.

With all of the foregoing changes and developments, and after a conference with and the agreement of counsel for the remaining parties, the trial court realigned the parties. As a result of the trial court's action, A.L. Huber & Son, Inc. (hereinafter Huber) became plaintiff and Husar Industries, Inc. (hereinafter Husar) became defendant. The case was finally tried, and on November 22, 1982, the jury entered its verdict for Huber on its Count I (account) in the sum of $5,193.52 and on its Count II (quantum meruit) in the sum of $23,287.67. On the same date, the trial court entered judgment and added interest, bringing the judgment amount on Count I to $6,864.44 and as to Count II, $30,782.20.

Huber filed an appeal, which was dismissed. Husar filed an appeal. Huber then filed a motion to reinstate its appeal. Huber then filed a cross appeal. The two cases on appeal were consolidated under the present case number. To prevent any more confusion relative to the party designation and description, this appeal will simply refer to the parties as Huber and Husar and in light of the judgment having been entered against Husar, this court will, for purposes of the disposition of this appeal, approach the points of alleged error presented by Husar as if he was the only appellant in the proceedings. This approach permits full discussion and consideration of all the issues between the parties on this appeal, including Huber's cross appeal.

The record discloses the following pertinent facts.

Huber is a general contractor. Husar is an automobile automatic transmission repair business. Both parties are closely held corporations in good standing. In 1976, Husar decided to expand its transmission repair business. This expansion included the erection of a new building. Husar decided upon property at 1620 Troost, Kansas City, Missouri as the location. This particular location was within an area under urban renewal, and as a result, Husar was able to secure favorable financing. After securing financing, Husar contacted Manuel Morris and hired Morris as the architect. Morris then drew the building plans. Husar then contacted various contractors for bids. Following several discussions with Husar and Morris, which included consideration of building specifications, Huber was selected as the contractor. On February 6, 1978, Husar and Huber entered into a written contract for the construction of the building.

The contract was a form contract prepared by the American Institute of Architects and called a "Standard Form of Agreement Between Owner and Contractor." It is also referred to as "A.I.A. 101." The con-

tract called for Huber to construct the building and for Husar to pay the sum of $328,597.00 therefor. In addition, the base contract incorporated other documents as a part thereto. These other documents included A.I.A. A201, which provided for General Conditions of the Contract for Construction, final building plans, and specifications. Huber was to build a "shell" type building, and Husar was to finish most of the interior. The building encompassed some 31,000 square feet. Husar was to use the building for storage of transmissions and machinery related to the service and rebuilding of transmissions. Husar had from 1,500 to 2,000 transmissions on hand at any one point in time, and it was contemplated that these would be stored on racks along the interior walls.

Husar testified that he had disclosed to Huber and Morris the intended use of the building. Huber testified that he did not know of the intended use. Morris had previously stated that Husar was very secretive about the building's use.

The contract provided for periodic payments as the work progressed. Payments were made conditional upon approval of the work by the architect. The contract further provided at the point of "substantial completion", 90% of the contract price was due the contractor, and that within 30 days thereafter, the remainder of the contract price was to be paid "provided the work has been completed, the Contract fully performed, and a final Certificate for payment has been issued by the Architect."

Huber commenced work on May 31, 1978. The location was cleared of surface trees and debris in preparation of excavation for the foundation. As the excavation proceeded, buried debris consisting of foundations of old buildings, bottles, cinders, and other matter was encountered. This debris was the buried remainder of buildings which had been previously razed by the urban renewal program. It had to be removed in order that excavation and preparation of the building foundation could

proceed. The removal and the attending cost are the basis of Huber's quantum meruit claim, and a more detailed discussion of the facts relative thereto are disclosed infra.

Huber completed the excavation, and concrete footings were poured in July and August, 1978. The building designed called for the installation of pre-cast concrete "T" panels to be installed in "slots" designed into the top of the concrete footings. The "T" panels formed the walls of the building. The "T" panels were to be manufactured by the Wilson Company, but Wilson could not meet its commitment, so Huber secured "T" panels from the Omega Company. The "T" panels were shipped to the location, and they were found to be larger than the Wilson panels. In order to accommodate the Omega panels, the slots in the footings had to be enlarged. Additional excavation was also required. The slots were enlarged by sawing them with a concrete saw. Some of the panels had to be "pounded" by sledge hammer into place.

In late July, 1978, the architect Morris quit the project. Husar appointed a successor architect, John Hueser, eighteen days later. Hueser left the job in November, 1978.

The "T" panels were installed, the interior and exterior areas backfilled, and the roof was added. This was followed by the pouring of the concrete floor and the exterior asphalt drive and parking lot areas.

Huber left the job in December, 1978. Huber later testified that it did not know of any deficiencies in the job and that when it left the job, it was substantially complete. There followed a dispute relative to payment claimed due, the completeness and quality of work, and the payment for extra work claimed due Huber.

The record shows that at trial, Husar had paid Huber the sum of $285,314.29. In turn, Husar had been credited, for various physical items (doors, steps, etc.) plus a tax credit,[1] the sum of $10,300.19. There is no

1. Since this location was within an urban renewal area and within the ownership of the

Land Clearance for Redevelopment Authority,

dispute between the parties over these payments and credits. Allowing for payments and the credits, the balance claimed due was $32,982.52. It was Husar's position that none of the balance claimed was due because of deficiencies in Huber's workmanship.

In addition to the balance claimed due under the contract, Huber claimed $20,165.76 as costs for extra work in the excavation, $553.00 for providing builders risk insurance, and $2,568.91 for extending the south parking lot.

In support of its claims, Huber testified that the building was ultimately moved ten feet west of its original location.[2] This caused the original 12-foot "grassy strip" on the west side to be reduced to two feet. Huber claimed that with this change, Husar requested that this two-feet area be covered with concrete. Huber also claimed that Husar requested that the south parking lot be extended south and that a concrete sidewalk be added to the north edge of the south parking lot. Husar denied that he requested such changes and further stated that he had concerns that the south lot was too steep for trucks to back into the south loading dock. Huber testified that he provided Husar an estimate of $6,000 for the above changes and that Husar agreed to that price. It was Husar's testimony that Huber agreed to do the work for $2,000. This item in dispute is the $2,568.91 figure above. There was no formal change order to the contract regarding these changes and/or payment.

The parties agreed that Huber was responsible for parapet flashing, downspouts, downspout boots, precast panel repair, dock channel framing, and the striping of the parking lot. The cost to repair these items was, however, in dispute.

Husar, in addition to denying that anything else was due Huber under the contract and for the cost for the extra excavation, presented its counterclaim against Huber premised upon alleged deficiencies in the work done by Huber on the building. The greater bulk of the 1,400 plus pages of transcript before this court was produced as a result of the counterclaim.

In summary, Husar's complaint included alleged deficiencies in the thickness of the interior floor, saw cuts to the interior flooring, cracking and checking of the interior floor, non-level surfacing of the interior floor, the workmanship of the west concrete parking lot, deficiency of the south asphalt parking lot, exterior paint of the building, deficiencies in the backfilling and compacting of the earth around the perimeter (outside) of the building. In addition, it complained that the catch basin or drop inlet in the south parking lot would not accommodate water runoff. Concerning some of Husar's claims, Huber did not deny responsibility but did dispute the repair/replacement cost. Regarding other items, Huber denied any responsibility. The evidence on these various items was quite detailed with experts both on structure, construction, and costs being presented by both parties. It serves no purpose for this appeal to set forth in detail the controverted evidence in regard to these various items, and it suffices to state that such evidence was extensive and provided to the jury as the trier of fact for its consideration and determination.

As noted above, the jury returned its verdict in favor of Huber on Counts I and II. The jury also returned its verdict on Husar's counterclaim in favor of Huber. This appeal followed the overruling of timely-filed post-trial motions.

Husar presents four points which in summary charge that the trial court erred (1) in denying Husar's motion for judgment in accordance with its motion for directed verdict as to Huber's Count II (quantum meruit), because the uncontroverted evidence revealed that Huber did not obtain the written consent of Husar to do the extra work as required by the contract and hence, Huber was not entitled to recover said amount; (2) in denying Husar's motion for

---

no sales tax could be charged by any subcontractor or the general contractor.

**2.** This "relocation" was at the insistence of local officials.

judgment in accordance with its motion for directed verdict as to Huber's Count I (accounting under the contract price), because Huber failed to make a submissible case on said claim because Huber's evidence demonstrated that Huber failed to complete substantial items under the contract in a workmanlike manner; (3) in erroneously submitting an instruction because it was an unauthorized deviation from M.A.I. 26.07; and (4) in admitting evidence as to the amount of concrete used in the interior floor of the building and parking lot as a basis that the concrete work was in substantial compliance.

Under its point (1), Husar argues that the trial court should have entered judgment for Husar on Huber's quantum meruit claim because said work was "extra work" and Huber, contrary to the requirements of the written contract, did not obtain the written consent of Husar to perform the extra work.

This particular dispute arose out of and as the result of the removal of debris discovered when the initial excavation for this building commenced as pointed out above. When the debris was removed, it had to be replaced with soil acceptable for compacting and to serve as the soil base for the building footings and foundation. The evidence shows that workmen discovered the debris and advised Huber. Huber, in turn, told Husar. Husar took and maintained the position that removal of the debris and soil replacement were the sole responsibility of Huber. Mr. Husar visited the job site quite often and observed the excavation.

On at least one occasion, Mr. Huber and Mr. Husar had a conversation about the matter. Huber mentioned to Husar that payment for the removal of the debris and soil replacement was Husar's cost. Husar responded by declaring that such cost was Huber's. The original architect, Morris, had mentioned to Husar that there might be subterranean debris and that Husar would be responsible for the cost of its removal and the soil replacement. Husar admitted that he knew of the possibility of the buried debris, but disclaimed any re-sponsibility for payment. It was Husar's position that he had agreed to a price as per the contract, and absent any agreed-to change (by change order), Huber should bear the cost.

The evidence reveals the contract required that before any change order was effective, it had to be agreed to in writing by the owner (Husar), the architect, and the contractor (Huber). Concerning the removal of the debris and soil replacement, the evidence reveals that Huber and the architect (Morris) signed the change order applicable to that work. Husar refused to sign that change order. There is no dispute between the parties that the debris had to be removed and replaced by proper soil or that Huber expended the sum of $20,165.76 in doing the work.

The parties are sharply divided over the question of whether Huber is, in the first instance, even entitled to recover for such work. It is Husar's position that this work was "extra work" and thus subject to and resolved by the terms of the written agreement and the General Conditions within the specifications. Husar directs this court's attention to paragraph 36 of those General Conditions, which reads:

"36. *Extras:* Bills for extras will be allowed only when work is ordered in writing by the Architect with the consent and signature of the Owner. No bills based upon verbal orders will be considered by the Architect nor the Owner.

It is understood and agreed that in case of changes, additions, or modifications to these plans and specifications for which the Contractor intends to make extra charge, it is agreed between the parties that unless the Owner agrees to such changes, additions or modifications in writing, signed by him, including the additional charges for deductions thereof, that the agreed price for each of the changes, additions or modifications shall be the net sum of One Dollar, and the Contractor agrees to accept such said sum in full payment thereof.

When changes to the plans and specifications are ordered after the contract is

right571

let, the cost of said changes shall be presented to the Owner for consideration in itemized form with complete cost breakdown. After costs are approved, the formal Change Order shall be submitted by the Contractor to the Architect using American Institute of Architects Change Order Form G701."

From the foregoing, Husar concludes that under the terms expressed therein, Huber is either entitled to recover nothing or alternatively, is entitled to recover only the sum of one dollar.

In further support of its position, Husar cites to this court *Herbert & Brooner Construction Co. v. Golden,* 499 S.W.2d 541, 547 (Mo.App.1973) and *Ruemmeli-Dawley Manufacturing Co. v. May Department Stores Co.,* 231 S.W. 1031 (Mo.App.1921).

*Herbert & Brooner Construction Co. v. Golden, supra* was an action to enforce a mechanic's lien. As part of the claim, there were two items which were not part of the original contract. One item was the extension of a water main necessitated because the plans and specifications had incorrectly located a water main, and the other was for structural supports for air-conditioners not called for in the plans. In *Brooner,* the contractor and the architect signed the change order, the owner did not. This court ruled that the contractor could not recover because the contract provided that any extra work had to be agreed to in writing by the contractor, architect, and owner. This court declared, "It is the general rule, properly applied by the trial court to the facts in this case, that where a construction contract requires a written change order, there is no right to recover for extra work without such writing or waiver by the owner."[3]

It would appear on the surface that the instant case falls squarely within the rule announced in *Brooner, supra,* and Husar so argues. However, the instant case contains additional facts which distinguish, and thus remove, the instant case from the

rule in *Brooner.* Herein, the written agreement between the parties contains "ARTICLE 7, Miscellaneous Provisions", a portion of which reads, "Drawings for Husar Industries, Southwest corner 16th & Troost Avenue, Kansas City, Missouri, Sheet Nos. 1 through 4 inclusive, S1, S2 and PE, all dated February 1, 1978.

The foregoing provision refers to the following contained within the drawings for Husar, which reads, "7. Existing foundations, structures, rock excavation and buried debris not apparent to view and requiring special handling or removal are not included in this contract." The net effect of this provision rendered the removal of the debris herein *not subject* to the requirements of a change order. Thus, *Brooner* is distinguishable and not controlling.

As further authority, Husar cites to *Ruemmeli, supra* which was a case wherein recovery under quantum meruit was sought for extra work and labor, and the claimant introduced a contract in support of his quantum meruit claim. The court ruled that wherein the contract was introduced and it did not provide for payment for extra work, the claimant could not recover in quantum meruit because he was bound by the terms of the contract. Again, it is noted that the "extra work" was not, as found herein, excluded from the contract in *Ruemmeli.* In addition, unlike the claimant in *Ruemmeli,* the claimant (Huber herein) did not submit the contract in support of his claim for recovery under quantum meruit. The written agreement herein, as the record discloses, was introduced as evidence in support of Huber's claim on account under Count I of its petition. Huber's claim (Count II) upon quantum meruit was supported in evidence by change orders, the additional excavating costs, the awareness of Husar of the need for removal of the debris, evidence of the discussion of this need between the parties, and Husar's refusal to pay while being aware of the performance by Huber.

---

**3.** It is noted that Huber, as an additional argument, contends from the evidence that the jury could have found a waiver by Husar. Such was neither pleaded, nor is this court convinced a waiver in fact occurred. It is not considered further.

Huber's Count II (quantum meruit) sounded in equity and the manner in which it was presented is quite similar to that found in *McDowell v. Schuette*, 610 S.W.2d 29, 37 (Mo.App.1981). In *McDowell*, contractors sought recovery for the construction of a house in two counts, one for the balance claimed due under the contract and the second was upon quantum meruit for labor and materials furnished which were not within the written contract. The court in *McDowell* ruled, "In fact a pleading that sounds in both express contract and quantum meruit will permit recovery on either theory warranted by the evidence." *McDowell* finds application to the instant case.

■ This court finds that the removal of the debris and its replacement with proper soil was a proper matter in support for a claim in quantum meruit under the facts and circumstances of the instant case. The reason is twofold. First, as per provision number seven of the drawings and plans of Husar above, made a part of the written contract under ARTICLE 7, sub. 3 above, such work was not within the written contract and hence not subject to the change order provision and requirements called for in the written contract. Second, contrary to Husar's contention, the written contract, as the record reveals, was introduced by Huber in support of its claim on account for the claimed unpaid balance under the contract and not in support of its claim in quantum meruit.

Husar's point (1) is ruled against it for and upon the reasons set forth above.

Under its point (2), Husar seeks to convict the trial court of error in the trial court's refusal to have entered judgment in accordance with Husar's motion for directed verdict relative to Huber's Count I, or claim for the balance alleged due under the contract.

In support of this point (2), Husar argues that Huber failed to make a submissible case regarding its Count I because said evidence did not reveal that Huber had substantially completed certain material items in a workmanlike manner as required under the written contract. Husar speci-

fies the interior floor of the building, the west parking lot, and the exterior painting of the building. From this, Husar concludes such deficiencies deprived it from the intended use of the building.

■ Husar contends that "[t]he heart of this case is that Plaintiff (i.e., Huber) refused to make any corrections until it got paid. By the terms of the contract, however, Plaintiff was attempting to put the cart before the horse. Plaintiff was required to finish the work before it was paid." Husar then correctly cites to *McAlpine Company v. Graham*, 320 S.W.2d 951, 954 (Mo.App.1959), which rules that a contractor need not comply literally and precisely with his contract in order to receive payment if he has substantially performed his work. In addition, Husar cites to *Julian v. Kiefer*, 382 S.W.2d 723, 728 (Mo.App.1964), which rules that under prescribed circumstances, a building is substantially complete "when it has reached the state in its construction so that it can be put to the use for which it was intended even though comparatively minor items remain to be furnished or performed..." Husar is correct when it further contends that interrelated with the foregoing rules is the good faith of the contractor and the degree of defect is such as it will not deprive an owner of the benefit of his contract.

No exception can properly be taken to the foregoing principles relied upon by Husar. That is not the issue under its point (2). Rather, the question is whether there was sufficient evidence to have submitted Huber's Count I to the jury.

From Husar's position, all that remained due Huber was the 10% under the contract. Husar declares that Huber had received "what amounted to 90 percent of the contract price." Contrasted with that was Huber's claim that Husar still owed almost $86,000 or well above the 10%.

Husar points to Huber's acknowledgment that the exterior paint was supposed to consist of two coats, but there was only one. In addition, Husar points out to

claimed problems with the interior floor and the west parking lot as bad faith on Huber's part in not completing the contract.

In contrast, Huber points out the voluminous testimony submitted by Huber, consisting of Mr. Huber and experts on his behalf. In addition, Huber points out at the time it left the project, there was no architect because the architect (Hueser) had been discharged by Husar and there were no deficiencies brought to Huber's attention. In addition, Huber's evidence claimed that most of the complained-of items were "punchlist items".[4] Huber's evidence revealed no punchlist was ever compiled due to the absence of the architect.

■ A review of the evidence upon and relative to Huber's Count I reveals that there was sufficient evidence to have submitted that count to the jury. A directed verdict should not have been ordered unless the evidence and reasonable inferences therefrom are so strong that reasonable minds could not differ. *Jordan v. Robert Half Personnel Agencies of Kansas City, Inc.,* 615 S.W.2d 574, 586 (Mo. App.1981).

Husar's point (2) is ruled against it for and upon the reasons set forth above.

Under its point (3), Husar claims that the trial court erred in the submission of the following instruction because it did not properly conform to M.A.I. 26.07. The challenged instruction reads:

"INSTRUCTION NO. 10

Your verdict must be for plaintiff on Count I of its Petition if you believe plaintiff substantially performed its agreement to construct the building in a workmanlike manner.

The phrase "substantially performed" as used in this instruction means performance of all important parts of the contract with only slight variations."

The above instruction is then contrasted with M.A.I. 26.07, which reads:

"26.07 [1981 Revision] Verdict Direction—Breach of Bilateral Contract— When Substantial Performance Sufficient

Your verdict must be for plaintiff if you believe:

First, plaintiff and defendant entered into an agreement whereby plaintiff agreed (set out plaintiff's agreement) and defendant agreed (set out defendant's agreement), and

Second, plaintiff substantially performed his agreement [in a workmanlike manner], and

Third, defendant failed to perform his agreement, and

Fourth, plaintiff was thereby damaged. *[unless you believe plaintiff is not entitled to recover by reason of Instruction Number _____ (here insert number of affirmative defense instruction) ]."[5]

A comparison of M.A.I. 26.07 with the submitted instruction discloses the only omission from M.A.I. 26.07 to have been paragraph one addressing the entry of the parties to an agreement, paragraph third, which provides for failure of performance of the agreement and paragraph fourth, which provides the question of damages.

Husar argues that noncompliance with M.A.I. 26.07 makes the submitted instruction presumptively erroneous. Such is the general rule under M.A.I.

Husar's contention fails because those portions of M.A.I. 26.07 not found within the submitted instruction were omissions of facts not in dispute. While the parties are in dispute as to Huber's performance, there was no dispute that the parties entered into an agreement. Thus, paragraph first of M.A.I. 26.07 was not necessary. As to paragraph third, the dispute between the parties was whether Husar had substantially performed and not whether Husar had in fact fully performed. Thus, paragraph

4. A punchlist item is a list of deficiencies compiled by the owner, architect and contractor needing correction before final acceptance of a building.

5. It is agreed between the parties that the "tail" to MAI 26.07 has no application herein.

third was not necessary. Finally, as regards paragraph fourth, there was no need under the evidence herein to include a paragraph related to damages because as Huber correctly contends, the failure to pay money if and when properly due constitutes damages as a matter of law.

■ It is not reversible error for a trial court to omit from instructions those facts which are undisputed or uncontradicted. *Cline v. Carthage Crushed Limestone Co.,* 504 S.W.2d 102, 111 (Mo.1974). See also *Bethell v. Porter,* 595 S.W.2d 369, 375 (Mo. App.1980).

■ While failure to comply with M.A.I. is presumed to be error, the prejudicial effect thereof is to be judicially determined. Rule 70.01(c). It cannot be said that the instruction challenged herein constituted prejudicial error under the facts and circumstances herein.

Husar's point (3) is ruled against it for and upon the reasons set forth above.

Under its final point (4), Husar charges that the trial court erred in admitting evidence as to the amount of concrete used in the floor of its building and parking lot, because said evidence was hearsay due to the trial court's ruling that the bills from concrete suppliers were business records. Husar claims that the admission of these bills was prejudicial because one of Huber's witnesses opined that the floor and parking lot were in substantial compliance with the specifications based upon the average thickness of the concrete floor, which in turn was based upon the amount of concrete used.

Husar premises its argument under this final point upon what occurred during rebuttal evidence introduced by Huber. August Huber III, qualified as a civil engineer expert, was called, and part of his testimony contended that the interior floor and the concrete parking lot were in substantial compliance with the contract. As part of his opinion, Mr. Huber III calculated the average thickness of both the floor and the lot, and that calculation was in part based upon the amount of concrete supplied by

the concrete processors and their billing. Husar objected that the concrete bills were hearsay as not being within the Business Records as Evidence Act, § 490.680, RSMo 1978. The trial court, in ruling upon Husar's objection, stated:

"THE COURT: The fact that somebody else prepared them doesn't make them inadmissible under the business records act if, as part of the routine business, they took those and put them in their file. That may not sound too logical, but that's the law.

Many years ago some company got a medical report from a doctor. They put it in their file, and the Supreme Court said, once that becomes a part of their business records, it's admissible, regardless of who prepared it. In other words, somebody with the company, whose records had been offered, it is not essential that somebody from the company made the records. Somebody completely outside could have made them, if it was then sent to them, and then inserted in their records as part of their routine practice...

THE COURT: Just a minute.

All right. The ruling is—I think there was some testimony, and I don't recall the exact language, but at least it raises the possibility, when it came time to quit, that they might take back part of the load. But I think that that's a question, that's an issue that you can raise in questioning the accuracy of his conclusions such as is based on something that's absolute.

But that doesn't mean that it's not admissible. If we only admitted evidence that absolutely proved something one way or another, there wouldn't be much evidence admitted."

Husar's complaint is that the above ruling was prejudicially erroneous, because to admit evidence on the amount of concrete disclosed by the bills strongly corroborated Huber's claim of substantial performance as regards the interior floor and the concrete parking lot. Husar relies upon *Whitehead v. Martin,* 446 S.W.2d 505 (Mo.

App.1969) where a ruling similar to that set forth above was held to be erroneous. Husar further relies upon *Hughey v. Graham,* 604 S.W.2d 626, 631 (Mo.App.1980) for its proposal that reliance upon the concrete bills corroborated Huber's claim of only slight variance, and thus rendered the admission of this evidence prejudicial.

In contrast and correctly so, Huber points out that in addition to the testimony of Mr. Huber III, including the concrete bills, there was voluminous evidence in support of the analysis of the interior floor and the concrete parking lot. Mr. Huber III testified that he had reviewed and analyzed the core test data prepared by testing experts.

In addition to the testimony of Mr. Huber III, there was testimony of Richard Wilson, a licensed engineer, which included his having taken 39 core samples. Wilson testified that the average thickness of the slab "according to sampling that has been made, is 5 inches, 5⅛ inches, to be exact, when you take the testing that has been done by Mr. Husar's laboratory, so in that respect, knowing that everything is based on averages, then, yes, he (Husar) does have an average of a 5-inch slab and substantially has what he paid for." The record reveals that Wilson derived his calculations independent of any concrete billing.

In addition to Wilson, another expert, Paul Dwyer, testified that based upon samples he had secured, the floor in question was a nominal five inches [6] and that the floor was on the average slightly more than five inches.

The second or successor architect, Hueser, testified that he observed the pouring of the concrete, and it appeared that the "pour" was conducted in a workmanlike manner.

■ The trial court's ruling upon Husar's objection was error, but based upon the remainder of the evidence which, when compared with the concrete bills in essence established the same facts, it cannot be said that any prejudice resulted from the trial court's ruling. There being no prejudice to Husar in light of the remainder of the evidence, it follows that there was no reversible error. *Harris v. Goggins,* 374 S.W.2d 6, 15 (Mo. banc 1963); *State v. Zagorski,* 632 S.W.2d 475, 478 (Mo. banc 1982).

Husar's final point (4) is ruled against it for and upon the reasons set forth above.

There remains for disposition the cross-appeal of Huber. Huber alleges that it was entitled to judgment on its Count I, giving credit for the amount of the admitted settlement ($40,000.00) as between Husar and the original architect Morris. The trial court overruled Huber's post-trial motion for such credit and Huber charges this as error.

During trial, Huber moved to amend its reply to Husar's counterclaim by including the affirmative defense of satisfaction or partial satisfaction of Husar's counterclaim based upon the "eleventh hour" settlement of the claim by Husar against the architect.

Huber's argument is based upon its contention that Husar's counterclaim was against both Huber as the contractor and Morris as the architect for unworkmanlike performance and design defects. Thus, Huber argues that it was entitled to claim the $40,000.00 sum and thus, the result would bar any recovery by Husar as against Huber since Husar had been made whole. It is Huber's contention that the trial court erred in not reducing Husar's counterclaim by the application of the $40,000.00 settlement figure. Thus, Huber argues that Husar's counterclaim proceeded upon the theory that Morris and Huber were joint tortfeasors and Huber was thus entitled to credit for the $40,000.00. Huber cites to *Taylor v. Yellow Cab Company,* 548 S.W.2d 528 (Mo. banc 1977).

---

**6.** It must be noted that the concrete slab or floor was to be five inches as provided for in the plans and specifications.

The trial court, in denying Huber's motion to amend, made the correct ruling. Throughout the entire proceedings, the trial court and the parties carefully kept separate the evidence and the issues regarding design defects (Morris) versus unworkmanlike performance (Huber). *Taylor* does not control. The trial court did not err in denying Huber's motion to amend its reply or in overruling Huber's post-trial motion for judgment N.O.V. or alternatively for credit for the above-referred-to settlement. Huber's point on cross appeal is denied.

Judgment affirmed.

All concur.