**KANSAS CITY, A Municipal Corporation, Appellant–Respondent,**

v.

**KEENE CORPORATION, Respondent–Appellant.**

No. 75332.

Supreme Court of Missouri, En Banc.

May 25, 1993.

Rehearing Denied June 29, 1993.

C. Alan Runyan, David C. Eckstrom, Hampton, SC, Kenneth B. McClain, Steven P. Callahan, Independence, and Nordahl Holte and Richard Ward, Kansas City, for appellant.

C. Brooks Wood, Kristine K. Kraft, Kansas City; Philip W. Vogler, Philadelphia, PA; Spencer J. Brown, Keith A. Carey; Elizabeth M. Drill, Leland H. Carley; and John H. Altergratt, Jr., Kansas City, for respondent.

E. Robert Wright, Fresno, CA and Steven L. Wright, Missouri School Boards Ass'n, Columbia, for amicus curiae, Nat'l School Asbestos Class, et al.

Thomas C. Walsh and Douglas W. King, St. Louis, for amicus curiae, W.R. Grace & Co.

PER CURIAM.

This is the second appeal[1] from a suit filed by the City of Kansas City, Missouri, against Keene Corporation and others. The city claims damages arising out of a fireproofing spray containing asbestos that was used in the construction of the Kansas City International Airport (KCI). A verdict for actual and punitive damages was returned against Keene. The trial court entered judgment for the city on the award of actual damages but entered judgment notwithstanding the verdict in favor of Keene on the punitive damages award. The compensatory damage award was reduced by the amount paid to Kansas City in a settlement of a similar claim against the Johns–Manville Corporation bankruptcy fund. Kansas City and Keene cross-appealed. Following opinion by the Missouri Court of Appeals, Western District, this Court granted transfer. *Rule 83.03.* The judgment is affirmed.

KCI terminal buildings A, B and C were constructed between 1969 and 1972. The structures have two levels. The upper level is for passenger services. The lower level, referred to as the apron level, is used for airline maintenance and baggage handling. The ceiling of the apron level is made of corrugated metal with poured concrete above it, which serves as the floor of the passenger level. Beneath this ceiling are steel beams for support. Keene or its subsidiary manufactured and sold a substance called Pyrospray, an asbestos-containing fireproof material, which was applied to the ceiling and the beams of the apron level. Following a determination in 1985 that all asbestos-containing material should be removed, this action was commenced. When the case was tried, only two defendants remained, Keene and another party. Keene was the sole defendant against whom a verdict was returned.

I.

Keene's first claim on appeal is that the trial court erred in failing to direct a verdict in its favor because the undisputed evidence shows the statute of limitations had expired on plaintiff's claims based on strict liability, fraud and breach of warranty when this action was filed on August 12, 1986. These precise issues were addressed in the earlier appeal in this case.

In *Grace* the trial court had entered summary judgment in favor of Keene and other defendants based on the statutes of limitation. The court of appeals reviewed the record and determined that there were genuine issues of fact as to when the statutes

---

1. The first appeal is *Kansas City v. W.R. Grace & Co.,* 778 S.W.2d 264 (Mo.App.1989), referred to herein as *Grace.*

of limitation on the claims for strict liability, fraud and breach of warranty had begun to run. The summary judgment was reversed and the cause remanded to the trial court for further proceedings.

■ In reviewing a trial court's denial of a motion for judgment notwithstanding the verdict, the evidence is examined in a light most favorable to the party against whom the judgment is sought. *Burnett v. Griffith*, 769 S.W.2d 780, 783 (Mo. banc 1989). In reviewing a ruling on a motion for summary judgment, the record is viewed in a light most favorable to the party against whom the judgment is rendered. *ITT Commercial Finance Corp. v. Mid–America Marine Supply Corp.*, 854 S.W.2d 371 (Mo. banc 1993); *Zafft v. Eli Lilley & Co.*, 676 S.W.2d 241, 244 (Mo. banc 1984). Thus, the standard for reviewing the evidence regarding the statutes of limitation issue is essentially the same here as it was in *Grace*. Unless there is a change in the issues or the evidence, the court of appeals' previous holding constitutes the law of the case and concludes any issues decided on remand and subsequent appeal. *Gambel v. Hoffman*, 732 S.W.2d 890, 895 (Mo. banc 1987). Obviously, the issues here and the issues in *Grace* regarding the running of the statutes of limitation are precisely the same. The only question is whether there has been a change in the evidence.

The court of appeals in *Grace* had before it essentially the same evidence that was presented to the trial court below on the statutes of limitation issues. In 1972, following an inspection by representatives of the Occupational Safety and Health Administration (OSHA), contractors ceased using the asbestos-containing Pyrospray. Regulations known as the National Emissions Standards for Hazardous Air Pollutants (NESHAP) were promulgated by the Environmental Protection Agency on April 6, 1973. In 1976, the "McCrone" report confirmed that asbestos had been used in the fireproofing in terminals B and C. A 1977 report by the National Institute of Occupational Safety and Health (NIOSH) indicated that air samples showed that asbestos was below the minimum detectable level inside the terminals. Potential exposure to employees did not pose an immediate hazard. The report cautioned that asbestos should be replaced "where technically feasible."

In addition, both the summary judgment court and the jury had before them the testimony of the manager of the Environmental Hazard Section of the Kansas City Public Health Department that he believed asbestos-containing products posed a serious health problem for building occupants, and he advocated the removal of all asbestos from the buildings. The record also reflects that air samplings began in the mid–1970's at the instance of OSHA after airline employees made complaints.

The record before the jury and before the summary judgment court reflects that it was not until 1983, however, that OSHA unequivocally reported "that there was no level of exposure to asbestos below which clinical effects did not occur." From 1975 through 1990, various interested parties conducted air sampling at KCI. Not until 1990 did any sampling disclose asbestos fibers in excess of that found in ambient air. It was not until 1985, as a result of a report by Hygienetics, Inc., that a recommendation was made that asbestos materials be removed and replaced to eliminate concern about asbestos fiber fallout rates.

After reviewing essentially the same record that is before the Court here, the court of appeals in *Grace* concluded that there were "genuine issues of material fact as to when asbestos fibers were released into the environment of Kansas City's airport buildings and when Kansas City was capable of ascertaining a substantial and unreasonable risk of harm from the release." 778 S.W.2d at 271. The court noted that a cause of action for strict liability and fraud accrues "when the damage resulting therefrom is sustained and is capable of ascertainment." *§ 516.100.*[2] Therefore, the summary judgment was reversed on those claims.

With regard to the breach of express warranty claim, the representation by

---

**2.** All references to statutes are to RSMo 1986 unless specified otherwise.

Keene Corporation that Pyrospray was resistant to air erosion, assuring the safety of the application, was determined to be a promise of future performance in *Grace.* A cause of action for breach of warranty for future performance accrues when the breach is or should have been discovered. *§ 400.2–725(2).* Thus, there was a genuine issue of fact as to whether the representation of the safety of the asbestos product was capable of ascertainment prior to 1981. 778 S.W.2d at 272.

To prevail on its statutes of limitation claim here, Keene must establish a change in the evidence from that before the court of appeals in *Grace.* This Court has examined the lengthy transcript and Keene Corporation's brief on appeal. We fail to find any significant difference in the evidence here and that considered by the court of appeals in *Grace.* Because *Grace* establishes the law of the case, it may not be disturbed.

In reaching this conclusion, this Court is not called upon to decide whether *Grace* was properly decided. Under essentially the same facts now under consideration, the court of appeals held that the date of accrual of plaintiffs' claims was a disputed fact. Accepting, as we must, that decision as the law of the case, the factual questions were necessarily left in the hands of the jury.

Keene further argues that this Court should reconsider the requirement of *Grace* that the statutes of limitation only commence running when there is actual fiber release. In addition to the law of the case principles enunciated above, Keene submitted its defense to the jury under instructions consistent with the *Grace* decision. No effort was made to offer any instruction consistent with the theory now advanced. Having failed to raise its alternative theory before the trial court, the issue is not preserved for review.

## II.

Keene next asserts that the trial court erred in admitting evidence of Underwriters Laboratories' (U.L.) fire testing of "Pyrospray Type I." The trial court admitted the testimony of Dr. Michael Pierce along with memoranda that showed Keene surreptitiously tamped Pyrospray during U.L. fire tests in order to pass the tests. Keene claims the evidence was incompetent because Pierce lacked personal knowledge of the facts and because Pierce's assertions were not an admission of Keene. The record, however, shows that Pierce had personal knowledge of the facts as director of research and later as vice-president of engineering. Keene also argues that Pierce's memoranda about cheating on U.L. testing were not an admission of Keene. Nevertheless, admissions against interest made by an employee are admissible against the employer if the admissions are made in the scope of the employee's duties and the employee has some executive capacity. *Warrenton Campus Shopping Center, Inc. v. Adolphus,* 787 S.W.2d 852, 854 (Mo.App. 1990). It is not disputed that Pierce had an executive capacity. As vice-president of engineering, commenting on product testing is well within the scope of his duties.

Keene claims the evidence was irrelevant and immaterial, that it lacked probative value and was unfairly prejudicial. Substantial deference is given a decision of the trial court as to the admissibility of evidence, which will not be disturbed absent an abuse of discretion. *Oldaker v. Peters,* 817 S.W.2d 245, 250 (Mo. banc 1991). The test for relevancy is whether an offered fact tends to prove or disprove a fact in issue or corroborates other evidence. Here, the trial court found the evidence relevant to show fraudulent intent and to show whether asbestos was a necessary part of the product. According to a document prepared by Pierce at the time U.L. was doing its test, "the primary difference between an asbestos and an asbestos-free product is their tampability." As Pierce put it elsewhere, the asbestos "allows us to cheat" in order to gain approval of the product as fireproofing. The trial court did not abuse discretion in admitting this evidence.

## III.

■ According to Keene, the trial court erred by failing to direct a verdict for Keene on the fraud claim because plaintiff failed to show the following essential elements of the claim: reliance, falsity, intent and causation. Reliance, however, was shown by testimony of project manager Walter Giese that he had relied upon brochures from Keene in approving the product for installation.

The falsity of the representation was also shown. Keene stated in its brochure:

The light weight monolithic blanket of fiber, is unaffected by vibration or expansion and contraction of base material.

. . . .

. . . Laboratory tests prove Pyrospray Fireproofing effectively resists erosion, dusting or flaking due to high velocity air movement. . . .

. . . .

. . . Remodeling of area can be accomplished without damage or removal of the fireproofing, and safety of the structure is always assured.

There was ample evidence that the substance did not meet these standards and was unsafe. These representations were false, relied upon, done with the knowledge of Pierce, and caused damage when the city was required to replace the Pyrospray material.

While not overwhelming, some evidence of intent and causation was offered at trial. Intent was shown from numerous reports Keene received prior to 1972, which indicated that workers applying the material were exposed to the product and that the product could be released into the atmosphere during remodeling or renovation. Keene's laboratory tests viewed favorably to plaintiff were inconclusive regarding Pyrospray's resistance to dusting from vibration, expansion, construction or air movement. Viewing all this evidence in a light most favorable to the verdict, the trial court did not err in refusing to direct a verdict for Keene on the fraud claim.

## IV.

■ Keene urges that fraud was improperly submitted in Instruction No. 13 because the claimed representations were beyond the scope of the pleadings. Instruction No. 13 stated the following representations:

Pyrospray was "unaffected by vibration or expansion and contraction of base material;" and

"In most fireproofing applications does not require tamping;" and

"Resistance to Air Erosion—Pyrospray fireproofing effective resists erosion, dusting, flaking due to high velocity air movement," and

"Safety and Versatility—Pyrospray Fireproofing permits unrestricted ceiling design and location of partitions. Remodeling can be accomplished without damage or removal of the fireproofing, and the safety of the structure is always assured."

Plaintiff's allegations of the third amended petition included the following:

That in the course of their efforts to persuade the public, including Plaintiff, to purchase their products, Defendant Manufacturers made or caused to be made promises and representations that their products were safe, suitable for use, fully tested, and easy to maintain.

Said promises and representations were made to plaintiff or its agents by Defendants through their advertisements, brochures and trade publications, including brochures published in Sweet's Catalogue and relied upon by Plaintiff and its agents when selecting Defendant Manufacturer's Products.

. . . .

. . . Defendants made representations through sales literature and through architectural trade publications that their products had been fully tested, that they were safe, that they were suitable for use in public buildings, that they would normally last for the life of the building and that very little or no maintenance would be required to keep the asbestos products in suitable condition in The Airport Buildings.

The only significant difference between Instruction No. 13 and the plaintiff's petition is that Instruction No. 13 includes direct quotes from Keene's brochures. The instructions and the pleadings are substantially the same. Keene was not prejudiced by any dissimilarities inasmuch as the brochure was properly admitted in evidence.

## V.

Keene argues that for the reasons stated under point III, the plaintiff failed to prove the essential elements of the warranty claim, and for the reasons stated under point IV, the claim was beyond the scope of the issues and irrelevant. These claims fail for the reasons set forth above under points III and IV.

In addition, Keene argues plaintiff failed to give notice of the breach under § 400.2–607(3)(a), which requires the buyer, "within a reasonable time after he discovers or should have discovered any breach [of warranty] notify the seller of [the] breach or be barred from any remedy." The purpose of this requirement is to provide the seller with an opportunity to correct any defects, prepare for litigation, and prevent stale claims.

The notice contemplated by the U.C.C. does not require any particular formality or detail as to the nature of the buyer's complaint. "The content of the notification need merely be sufficient to let the seller know that the transaction is still troublesome and must be watched." U.C.C. (U.L.A.) § 2–607 Comment 4 (1989). In addition, the buyer is only under a duty to notify the immediate seller, not the manufacturer. *Ragland Mills, Inc. v. General Motors Corp.*, 763 S.W.2d 357, 361 (Mo. App.1989). The record here reflects that Keene's sales representative was notified as early as 1972 by the Kansas City Natural Slate Company, which sold the product to the city and installed the materials at KCI, that problems had developed with the Pyrospray not sticking to the beams. Also in 1972, a representative of Kansas City Natural Slate was made aware that OSHA officials had become concerned over the use of the asbestos-containing materials.

That evidence, considered in a light most favorable to the jury's verdict on the issue, supports a conclusion that the notice was sufficient to make Keene aware that the materials were "troublesome and must be watched."

## VI.

Verdict-directing Instructions No. 12, the breach of warranty claim, and No. 13, the fraud claim, are attacked by Keene on the basis that each contains multiple representations connected by the conjunction "and." Keene argues that such is prohibited by MAI 4th 1.02, which forbids "submitting dual or multiple theories" in the conjunctive. The argument overlooks the committee comment to MAI 4th 1.02. It points out that "some instructions will still have several *elements* which must be submitted in the conjunctive, but these will be in support of a *single theory of recovery or defense.*" (Emphasis in original.) Here the single theory of breach of warranty was supported by a series of representations found in a single brochure distributed by Keene. The same is true of the single theory of fraud. As previously noted, the brochure was in evidence, and there was no violation of the rule prohibiting submission of conjunctive theories of recovery.

## VII.

Keene argues that the fraud "by silence" claim should not have been submitted because there was no evidence to establish (1) an omission (2) to induce the purchase (3) of material facts (4) not within the fair and reasonable reach of plaintiff. As previously noted, there was evidence that Keene was informed of potential dangers of asbestos to workers applying the material as early as 1969. Much of that information was the product of studies and tests commissioned by the trade organization of sprayed mineral fiber manufacturers and was not in the public domain. However, Keene did not pass any of that information along to its customers in its advertising brochure or by placing warnings on the packaging material. The purpose of the

brochure was to induce the sale of the Pyrospray. Viewed in a light most favorable to the verdict, there was sufficient evidence to indicate the hazards of the product were not within the fair and reasonable reach of plaintiff.

## VIII.

Keene's eighth point asserts that Instruction Nos. 13 and 14, the fraud verdict-directing instructions, failed to hypothesize that plaintiffs used ordinary care in relying on the representations. These claims were not preserved by objection at trial nor in the motion for new trial. Objections to instructions will not be considered when raised for the first time on appeal. *Rule 78.07.*

## IX.

In 1979, the city settled a lawsuit against the general contractor and the design engineer for deficiencies in the airport buildings. The city executed an agreement on August 7, 1979, which released not only the parties to the lawsuit but all suppliers from liability for present and future liabilities for claims asserted in that lawsuit. None of those claims included asbestos contamination. Keene now argues the releases should be a complete defense to this action. The same issue regarding release was presented in *Grace,* and the court of appeals determined that the release did not bar future claims relating to asbestos contamination. Under the law of the case doctrine, that decision is binding here.

## X.

Keene argues that the verdict-directing instructions on strict liability for faulty design and failure to warn, Instruction Nos. 10 and 11, fail to hypothesize actual fiber release and unreasonable risk of harm. Keene claims those events were critical to plaintiffs' cause of action under *Grace.*

The precise holding of *Grace* was that a cause of action for asbestos contamination accrues upon the release of toxic asbestos fibers into the environment together with the ability to ascertain a substantial and unreasonable risk of harm from the release of the toxic asbestos fibers. 778 S.W.2d at 268. The issue in *Grace* was directed to the question of when the statute of limitation begins to run, not the elements of plaintiffs' cause of action for strict liability. Because the issue is different, the argument that *Grace* controls the elements of the cause of action must fail. Instruction Nos. 10 and 11 were unmodified MAI instructions and properly submitted strict liability. *See Elmore v. Owens–Illinois, Inc.,* 673 S.W.2d 434, 437–38 (Mo. banc 1984).

## XI.

In regard to the failure to warn claim, Keene argues that the trial court erred in failing to direct a verdict for Keene because plaintiff argued Pyrospray could not be used safely, even with the warning sought. The failure to warn claim and the defective product claim can both be made if there is evidence to support each theory and if neither theory requires the proof of a state of facts that would necessarily disprove a state of facts necessary to the other theory. *Lewis v. Envirotech Corp.,* 674 S.W.2d 105, 112 (Mo.App.1984). Here, the jury could find that plaintiff would not have installed the product if a proper warning was given concerning the health hazard. The jury could also find that Pyrospray was unreasonably dangerous when used in a manner reasonably anticipated. The court did not err in failing to direct a verdict for Keene on the claim of failure to warn.

## XII.

Keene argues that it was entitled to a directed verdict on the strict liability claims because the city failed to prove (1) the Pyrospray was unreasonably dangerous, (2) damage to "other property" from Pyrospray, and (3) causation of damages from Pyrospray. First, the 1985 Hygienetics Report indicated extensive fireproofing damage in the apron level, with small pieces of fallen fireproofing in many areas of the apron level. Second, plaintiffs called experts who testified that by 1986, sprayed fireproofing material was separat-

ing from the beams and walls of all three terminal buildings. In at least one area, the material was hanging from the beams and had fallen to the floor. One of the experts testified that the only option by that time was removal of the asbestos. This condition created an immediate threat of release of asbestos fibers and indicated earlier release of the asbestos fibers. Viewed in a light most favorable to the verdict, this situation created an unreasonably dangerous health hazard. The "other property" damaged was the terminals. The evidence shows that the terminal was damaged because, in order to make the terminals reasonably safe and usable, the Pyrospray had to be removed and replaced. *See School Dist. of Independence v. U.S. Gypsum Co.,* 750 S.W.2d 442, 457 (Mo.App. 1988). The evidence clearly showed that the city was damaged by the cost attributable to the removal and replacement of the asbestos-containing product from its terminals.

### XIII.

██ Keene asserts the trial court erred in refusing to admit testimony of Dr. Elliott Hinkes to compare the risk of illness from exposure to asbestos with the risk of illness from other substances and activities. The offer of proof shows that Dr. Hinkes would have testified concerning relative cancer risk from encounters in everyday life, such as eating charcoal broiled steak, flying an airplane or living in a brick house. The trial court has discretion to refuse to admit evidence designed to sidetrack the jury from considering the danger inherent in the product under consideration. *Destin v. Sears Roebuck & Co.,* 803 S.W.2d 113, 116 (Mo.App.1990). Here, there was no abuse of discretion.

### XIV.

██ Keene claims the evidence failed to prove that all the damages of the apron level were attributable to Pryospray. William Stephan, the superintendent for Kansas City Natural Slate, observed bags of

Pyrospray stacked in the downstairs portion of the terminals during construction. Another product was used in the upstairs passenger service level. During the construction, Keene sent a representative to look at the fireproofing material when some of it had fallen off on the apron level. Some of the samples of the product were taken by Keene from the apron level for analysis. While Keene denied that the product used on the apron level was defective, it never suggested that the product was not Pryospray. One witness, who was an officer of the other defendant in this case, testified that he observed the fireproofing in the apron level during construction, and it appeared to be the product of his competitor, Pyrospray. This evidence was sufficient to create a fact question as to whether the substance on the ceiling in the apron level was Keene's product.

### XV.

██ Keene argues that the trial court erred in giving Instruction No. 15 because it required the jury to award plaintiff all of its removal costs, thus depriving the jury of its discretion to determine damages. According to Keene, the jury could have found that removal of the product was unnecessary. Instruction No. 15 stated:

In Verdict B, if you find in favor of plaintiff, then you must award plaintiff such sums as you may find from the evidence to be the cost of repairing the damage to plaintiff's building, including the cost of maintaining, removing, and replacing defendant Keene's asbestos-containing fireproofing product Pyrospray.

The overwhelming evidence was that because of the flaking and renovation which had occurred by 1985, the asbestos material must necessarily be removed. Instruction No. 15 was not erroneous for stating that damages included removal costs.[3]

### XVI.

██ Keene claims the trial court erred in admitting plaintiff's exhibit 185, a

---

3. Keene makes no claim that the instruction omitted the word "reasonable" before the word

"cost" in the instruction. *See MAI 4th 4.02* Note on Use 2.

report dated August 17, 1966, from a Pennsylvania health official regarding X-rays taken of employees at a manufacturing facility for Pyrospray showing numerous cases of asbestosis. The report, offered for the purpose of showing notice, was previously referenced at length in the deposition of Glen Bailey, which was read to the jury. Where testimony or other evidence has been admitted that establishes, in essence, the same facts as those established in a document, the admission of the document is not prejudicial error. *Husar Industries v. A.L. Huber & Son, Inc.,* 674 S.W.2d 565, 575 (Mo.App.1984). No prejudicial error resulted from the admission of exhibit 185.

■ Also, Keene argues the court erred in excluding Keene's exhibit intended to rebut plaintiff's exhibit 185. At issue was whether Keene had notice of the dangers of the product. The rebuttal evidence consisted of reports on the health of employees and results of dust surveys and X-rays at plants where Pyrospray was not manufactured. These were truly collateral issues and were properly excluded.

### XVII.

■ Keene claims a 1982 letter from Keene to U.L. regarding licensing of Pyrospray should not have been admitted because it was irrelevant and unfairly prejudicial. The letter stated that Keene had transferred the technology and manufacturing rights along with the U.L. rights to a firm in Mexico. Plaintiff argues that the letter is admissible to show a plan or design involving fraudulent intent. In a fraud case, other transactions of a party having a tendency to explain the motives present, if not too remote and conjectural, may properly be admitted. *Pinger v. Guaranty Investment Co.,* 307 S.W.2d 53, 56 (Mo.App.1957). While the letter was of questionable relevance, it cannot be said that the trial court abused discretion in admitting the letter.

### XVIII.

■ Next, Keene argues the trial court erred in admitting a Keene marketing plan for 1972 because it was irrelevant and prejudicial. The plan stated Keene intended to sell Pyrospray in areas where it was still allowed, including Kansas City, while developing and marketing an asbestos-free fireproofing, KeeneKote. At trial Keene offered no objection to the admission of this document. The point is denied.

### XIX.

■ Keene likewise disputes the admission of internal memoranda from an advertising agency working for Keene. The memoranda address publicity and advertising concerns from health hazards in asbestos insulation. The documents were admitted to show notice and fraudulent intent, and there was no abuse of discretion.

### XX.

■ The trial court erred, Keene now complains, in refusing to grant a new trial on the grounds that plaintiff's closing argument misstated facts and was calculated to arouse and inflame the jury. Once again, the question for this Court is whether the trial court has abused discretion in denying relief. *Cook v. Cox,* 478 S.W.2d 678, 682 (Mo.1972). New trial is available only upon showing that trial error or misconduct of the prevailing party incited prejudice in the jury. *Larabee v. Washington,* 793 S.W.2d 357, 359 (Mo.App.1990). Keene points to the following portions of plaintiff's closing statement:

> The [Underwriter's Laboratory] test was tamped. They cheated. If they were cheating on a fire test that is suppose [sic] to help a building withstand heat, well, wouldn't they leave asbestos in the product?
>
> . . . .
>
> ... Mr. Volger told you that Keene— basically that Dr. Pearce really didn't know what he was saying when they were talking about the Underwriter's Laboratory test cheating. You look at the documents. You look at that exhibit, and you decide.
>
> What was going on there was the same thing going on in the sale of this

product, and that is that they wanted to be able to avoid the cost associated with having to take the steps to retest their product. They had tested their product before by tamping it.

He says that the UL test documents don't show that. Of course it doesn't. It would never have passed if it did. They were fooled. They knew they were fooling.

. . . .

That's the kind of company that decided, even after they had this nonasbestos product on the market, to sell Pyrospray in areas where it was still allowed. Kansas City.

. . . .

They didn't care enough to just get rid of this material. They tried to unload it on an export basis, the asbestos-containing product.

And then they ended up in 1982 selling the rights to Pyrospray to a Mexican company.

. . . .

The plaintiff, Kansas City, asks you to return a verdict for our actual damages; and for the damages that will tell this company not to do that again.

Damages that will tell Mr. Glen Bailey of Wall Street in New York City, you shouldn't engage in this kind of conduct. You shouldn't continue to sell a product that you have, when you have a product that's nonasbestos containing, to Kansas City, and other areas where it is still allowed. That's just plain wrong. Thank you.

The U.L. testing, selling the rights to a Mexican firm, and continuing to sell Pyrospray in areas where it was not prohibited were all matters properly admitted into evidence. The argument drew no objection from the defendant. Similarly, the single statement asking for punitive damages "to tell Mr. Glen Bailey of Wall Street in New York City, you shouldn't engage in this conduct" drew no objection. Where the defendant failed to make an objection to the argument at trial, the trial court did not abuse discretion in refusing to grant a new trial.

## XXI.

■ Keene contends that a new trial should have been granted because evidence improperly admitted on punitive damages tainted the jury's finding on actual damages. The verdict for actual damages was supported by the evidence. Keene does not identify the evidence offered in support of the punitive damages claim that was unrelated to one of the other grounds for recovery. For that reason, the claim is denied.

## XXII.

■ The trial court erred, Keene argues, in refusing to deem certain admissions as judicial admissions instead of evidentiary admissions. Keene's complaint addresses two assertions in the plaintiff's brief in *Grace:* (1) in the 1970's the medical and scientific community generally believed that asbestos-containing building products presented a "safe" level of exposure to asbestos fiber, and (2) fireproofing manufactured by both Keene and the other defendant, Asbestospray, was installed at the apron level of KCI.

■ Facts stated in a brief filed in a prior appellate proceeding in a case constitute ordinary admissions against interest, which are admissible in subsequent trials or hearings. *Mitchell Engineering Co. v. Summit Realty Co., Inc.,* 647 S.W.2d 130, 140–42 (Mo.App.1982). Such statements of fact are not binding and conclusive judicial admissions. *Id.* Here, the statements in the brief were made at a time when discovery was limited to the statute of limitations issue. The trial judge correctly ruled that the previous statements were not conclusive as judicial admissions.

## XXIII.

■ Finally, Keene attacks the admission of testimony concerning NESHAP regulations. These regulations were promulgated by EPA under the Clean Air Act and became effective in April, 1973. *40 CFR § 61 et seq.* The trial court permitted evidence of later amendment to the NESHAP regulations addressing the renovation of buildings with asbestos materials. The tes-

timony was that the regulations provided for removal of asbestos material if any renovation project involves disturbing more than 160 square feet of asbestos-containing material. NESHAP rules are relevant to the issue of damages, and the testimony concerning the rules was relevant to show the costs and requirements for removing the asbestos in connection with renovation projects at KCI. The trial court did not err in admitting testimony concerning the NESHAP regulations on renovation projects.

## XXIV.

 In Kansas City's cross-appeal it first claims that the trial court erred in granting Keene's motion for judgment notwithstanding the verdict on its punitive damages claim in connection with the strict liability claim.

 The question now to be decided is whether there was sufficient evidence to establish that defendant's conduct in selling its product was outrageous because of an evil motive or reckless indifference to the rights of others. *Burnett v. Griffith,* 769 S.W.2d 780, 789 (Mo. banc 1989). Punitive damages may be awarded only where the defendant knew of the defect and danger of the product and, by selling the product, showed complete indifference to or conscious disregard for the safety of others. *Angotti v. Celotex Corp.,* 812 S.W.2d 742, 746 (Mo.App.1991). The evidence here is considered in a light most favorable to plaintiff, and evidence favorable to the defendant is disregarded. *School Dist. of Independence v. U.S. Gypsum Co.,* 750 S.W.2d 442, 446 (Mo.App.1988). The record includes the following evidence, which the city claims supports submission of punitive damages:

Officers and employees of B.E.H., Keene's predecessor, became aware that operating personnel should take every precaution in applying the spray wool to prevent its "flying in the air since it is very dangerous to health of *operating* personnel" (emphasis added). In 1966 B.E.H. was informed by the state of Pennsylvania that various persons who had worked at their Valley Forge, Pennsylvania, plant where the asbestos-containing products were manufactured had developed asbestosis.

B.E.H. became a member of the Sprayed Mineral Fiber Manufacturers Association (SMFMA) in the mid–1960's. In 1966, through membership in that organization, B.E.H. learned of a 1964 study by Dr. Irving Selikoff, which indicated that those working in asbestos were exposed to a greater chance of asbestosis and carcinoma. He hypothesized that "asbestos exposure in industry will not be limited to the particular craft that utilizes the material ... insulation workers undoubtedly share their exposure with their workmates in other trades."

The report moved SMFMA to commence a testing program relating to job site spraying and erosion tests of the material in place. While these tests had varying degrees of success, the ultimate conclusion was that spray operators should wear respiratory protection while applying the materials. By contrast, the erosion test results were described as "very good."

In 1968, after Keene purchased B.E.H., Keene became privy to an advertising proposal that made reference to the "dusting" *during application* of asbestos-containing products, creating a "suspected hazard." The advertising proposals suggested that Keene and B.E.H. reduce or eliminate the asbestos content of its product completely. A confidential public relations report in January, 1969 to Keene Corporation concluded:

> There is a real possibility that asbestos may be a far more serious health hazard than previously suspected, and that it could affect a far larger number of people.... Some of the same research, however, has tended to cast doubt on other fibers and industrial dust.... *[T]he absence of asbestos may not automatically free a product of suspicion.* (Emphasis added).

An industry publication in 1970 quoted Dr. Selikoff as saying, "[A]fter the material dries, loose particles are free to thoroughly contaminate large areas both in and surrounding a building thus treated. I

urge manufacturers and industry to view this threat seriously and find immediate means for controlling the hazards to millions of innocent citizens." There was no evidence that any representative of Keene was present when Dr. Selikoff made his statements or that Keene was otherwise specifically informed of the contents of his statements. In addition, the statements made no reference to any scientific studies indicating asbestosis or cancer rate increases among persons occupying a building where asbestos fireproofing has been sprayed. The statement was no more than an unsubstantiated hypothesis.

In a letter mailed to Keene in 1970, the president of SMFMA noted a report that an asbestos sprayed ceiling at Rutgers University had not been properly given a seal coat to prevent erosion and flaking of the asbestos. The letter indicated that flaking and dusting from an unsealed coating of asbestos spray "contributes hazardous materials to the ambient air." The evidence in this case does not indicate that the Pyrospray in the terminal buildings lacked a proper seal coat. In addition, there is no showing that the material on the ceiling at Rutgers University was the same or similar to Keene's product.

Finally, plaintiff points to the admission from the witness stand by one of Keene's employees that he knew the fireproofing would be disturbed in the event of renovation or demolition. This evidence did not establish knowledge that the product was dangerous to persons other than unprotected workers during construction.

The theory upon which plaintiff tried its strict liability claim was that Pyrospray was subject to flaking and dusting due to erosion or remodeling, thereby exposing KCI employees and patrons to such an unreasonable danger of asbestosis or cancer that removal of the product was required. The evidence shows that as of 1972, Keene had no knowledge that the product was dangerous to persons other than unprotected workers regularly exposed to the product during its manufacture, application or, perhaps, removal. There is no evidence that Keene had an evil plan to injure KCI employees and patrons. Evidence of a generalized knowledge that asbestos poses a danger to a narrow class of unprotected persons who are exposed during the application or removal of asbestos-containing materials in buildings will not, under the strict requirements for a submissible punitive damages case, support an inference that plaintiffs had knowledge of a danger to the much broader class of persons who were merely present in such buildings at other times. *School Dist. of Independence v. U.S. Gypsum Co.*, 750 S.W.2d at 447. The evidence of knowledge of the danger to unprotected construction workers is insufficient to establish that Keene exhibited a complete indifference or conscious disregard to the safety of KCI employees or patrons using the terminals.

## XXV.

■ Plaintiff argues the trial court erred in granting a judgment notwithstanding the verdict because the jury was presented sufficient evidence to sustain the punitive damages award under the fraud submissions.

■ Not every misrepresentation of fact justifies submission of punitive damages. Otherwise, a false statement, no matter how innocent or reasonably based, would subject a defendant to punitive damages. *McDonald v. Ozark Machinery Co.*, 720 S.W.2d 42, 44 (Mo.App.1986). The fraud claims, similar to the strict liability claims, were tried and submitted on the theory that statements in Keene's brochure were false regarding Pyrospray's resistance to dusting and flaking, thereby creating an asbestos hazard to KCI employees and patrons and requiring removal of the product. The associated punitive damages claim required not only that defendant make intentionally false statements regarding the product's resistance to dusting and flaking, but also that when the representations were made the defendant had knowledge of the danger that resulted in the plaintiff's damages. Again, the evidence that Pyrospray was dangerous to unprotected construction workers routinely exposed during application or removal of the

product was not evidence of the danger later identified in the 1985 Hygienetics report as requiring the complete removal of the product from the terminal buildings.

Only by superimposing the twenty-twenty hindsight of regulatory law, medical science and technology arising after 1972 can one infer knowledge of any danger to KCI employees and patrons that would require removal of the product. The evidence again is insufficient to show that defendant had knowledge of the defect and danger to KCI employees and patrons which in turn formed the basis of plaintiff's damages. The trial court correctly sustained the motion for judgment notwithstanding the verdict regarding the punitive damages claim.

## XXVI.

■ Next, Kansas City asserts that actual damages should not have been reduced by the amount the city received from the Manville bankruptcy fund because the court lacked jurisdiction and that a final judgment had previously been entered, and the requirements of Rule 74.06(b) were not met. The trial court ruled on Keene's motion for judgment notwithstanding the verdict or for new trial on July 25, 1991. The ruling did not address one of the points argued in the motion and suggestions in support, which sought to reduce the damages by the amount of the Manville bankruptcy fund payments. The city filed its notice of appeal from this order on July 29, 1991. On August 1, 1991, Keene moved to reduce the damages by the Manville bankruptcy payments. The hearing was held on August 2, 1991. The motion was granted. The judgment was reduced by $223,568.38. The appeal from that order was consolidated with Kansas City's cross-appeal.

Plaintiff argues that although the ruling on the motion for new trial did not pass on Keene's suggestion that the judgment be reduced by the payments from the Manville bankruptcy, under Rule 81.05 the suggestion was deemed overruled by the ruling on July 25, 1991, which was a final judgment and the court then lost jurisdiction over the judgment. Plaintiff misapprehends the purpose of Rule 81.05. That rule begins,

"For the purpose of ascertaining the time within which an appeal may be taken, a judgment becomes final...." That rule was not intended to address the jurisdiction of the trial court to enter satisfaction of judgment but rather was intended to address finality for the purposes of appeal.

Rule 74.06 provides that on motion and on terms that are just the trial court may order relief where a judgment has been satisfied. The motion shall be made within a reasonable time, and notice must be served pursuant to rule 54. *Rule 74.06(c)*. Although in this case notice was not provided as contemplated under the rule, plaintiff was not prejudiced because the issue was argued as early as the motion *in limine*. The city's claim on this point is denied.

## XXVII.

■ Plaintiff finally argues that the Manville bankruptcy fund payments were a noncreditable collateral source. Plaintiff nevertheless agreed at trial to set off the Manville fund payments, and the trial court's order reflected this agreement. The city, having taken the position that the Manville payments were a proper setoff before the trial court, cannot argue a different position on appeal.

## CONCLUSION

The judgment is affirmed.

COVINGTON, THOMAS, PRICE and LIMBAUGH, JJ., concur.

HOLSTEIN, J., concurs in separate opinion filed.

ROBERTSON, C.J., and BENTON, J., concur in opinion of HOLSTEIN, J.

HOLSTEIN, Judge, concurring.

I fully concur in the majority opinion. However, I believe some additional observations are appropriate.

On occasion a punitive damages count is added to an ordinary action in contract or tort where there is no justification other than that a defendant is perceived to have a "deep pocket." In such cases, the only conduct which may be characterized as evil

is that the defendant is in business for profit and does not cease all operations when confronted with an inconclusive epidemiological study involving its product. In this case, had the defendant been an individual who had donated the asbestos containing material, it is likely no jury would ever return a punitive damages verdict.[1] The crux of the "evil" is that the defendants are in business for profit. As a result, punitive damages have occasionally been abused by becoming a method for redistributing wealth rather than carrying out the functions for which punitive damages were designed.

For that reason, I believe it is time for the courts to start placing reasonable restrictions on when and how punitive damages may be sought and obtained. A compelling argument can be made that punitive damages should not be permitted where there is no personal injury or illness and the claim arises solely because of a latent defect in a product or out of a breach of warranty. At least one state has held that in products liability cases where the only damages are to property, there can be no punitive damages. *Eisert v. Greenberg Roofing & Sheet Metal Co.*, 314 N.W.2d 226, 228 (Minn.1982).

Another suggested restriction on such claims would be to increase the evidentiary standard. In this case, the punitive damages claim was submitted pursuant to the same burden of proof instruction as was the strict liability claim. *See MAI 4th 3.01.* Without extensive discussion or citation to precedent, this Court recently declined to apply a "clear and convincing" evidence standard to punitive damages claims. *Menaugh v. Resler Optometry, Inc.*, 799 S.W.2d 71, 75 (Mo. banc 1990). The only rationale cited was that requiring a higher evidentiary standard would be contrary to "the normal requirements in the submission of civil cases." In a what I believe to be a prescient concurring opinion, Chief Justice Robertson suggested that Missouri

should consider adopting a "clear and convincing" evidence standard regarding punitive damages. Because the legislature had never spoken on the subject, Chief Justice Robertson was reluctant to force the issue. 799 S.W.2d at 76 (Robertson, C.J.) I am now persuaded that we were wrong in *Menaugh* and that Missouri, as to common law actions for punitive damages, should adopt a higher evidentiary standard.

Contrary to the holding in *Menaugh,* there are diverse classes of cases requiring a higher standard of proof than preponderance of the evidence. Examples include equitable actions to reform deeds or impose constructive trusts. *Fix v. Fix,* 847 S.W.2d 762, 764–65 (Mo. banc 1993); *Bollinger v. Sigman,* 586 S.W.2d 773, 775 (Mo.App. 1979). Proceedings to establish mental illness or establish paternity after the death of the father by statute require a higher standard of proof. *§§ 474.060.2(2)* and *632.350.2.* Termination of parental rights, enforcement of oral promises to pay debts of another, claims of gift and termination of life-sustaining treatment of an incompetent person all require proof exceeding the preponderance of the evidence. *In re J.D.K.,* 685 S.W.2d 876, 879 (Mo.App.1984); *Autoquip Corp. v. Nicholson and Associates, Inc.,* 740 S.W.2d 664, 668 (Mo.App. 1987); *In re Estate of Passman,* 537 S.W.2d 380, 384 (Mo. banc 1976); *Cruzan v. Harmon,* 760 S.W.2d 408, 425 (Mo. banc 1988), *aff'd,* 497 U.S. 261, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990). Punitive damages may not constitutionally be awarded in defamation or slander cases under a "preponderance of the evidence" standard. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 350, 94 S.Ct. 2997, 3011, 41 L.Ed.2d 789 (1974). *See also MAI 4th 3.06.* These cases establish that the premise upon which this Court relied in *Menaugh* to support its conclusion regarding the burden of proof standard was not entirely supported by caselaw.

In each of the classes of civil cases noted above, an evidentiary standard of "clear

---

1. Dean Dorsey D. Ellis, Jr., of Washington University, reports that a recent study by the RAND Institute of Civil Justice found that punitive damages awards were on the increase in number and amount in product liability cases. The RAND study further disclosed that the average award against businesses was substantially larger than such awards against an individual. Ellis, *Punitive Damages, Due Process, and the Jury,* 40 Ala.L.Rev. 975, 985–86 (1989).

and convincing" or "clear, cogent and convincing" evidence has been applied. While apparently unrelated, the cases to which the higher evidentiary standard has been applied do have a common thread. In each class of cases the remedy is so extraordinary or harsh that it should be applied only sparingly. The question which necessarily must be examined is whether the punitive damages remedy falls in that category of cases to which a higher evidentiary standard should be applied.

Punitive damages are not designed to compensate injured parties. They are designed for punishment and deterrence of misconduct. *State ex rel. Smith v. Greene*, 494 S.W.2d 55, 60 (Mo. banc 1973). The fundamental difference between civil law and criminal law is that the role of the former is to make those persons whole who have been injured or wronged by the conduct of another party. The purpose of the criminal law is to protect and vindicate the interests of the public as a whole, to punish the offender and deter others. W. Prosser, *Handbook of the Law of Torts* § 2, at 7 (4th ed. 1971). Punitive damages serve a function normally attributed to the criminal law. Because the criminal law imposes harsh sanctions as a punishment, it requires evidence beyond a reasonable doubt.

The penal nature of the punitive damages remedy has led a growing number of jurisdictions to conclude that exemplary damages must be established by the middle level standard of proof, clear and convincing evidence. *Acosta v. Honda Motor Co., Ltd.*, 717 F.2d 828, 839 (3d Cir.1983); *Roginsky v. Richardson–Merrell, Inc.*, 378 F.2d 832, 850 (2d Cir.1967); *Raynor v. Richardson–Merrell, Inc.*, 643 F.Supp. 238, 245 (D.D.C.1986); *Linthicum v. Nationwide Life Ins. Co.*, 150 Ariz. 326, 332, 723 P.2d 675, 681 (1986); *Travelers Indemnity Co. v. Armstrong*, 442 N.E.2d 349, 362–63 (Ind.1982); *Tuttle v. Raymond*, 494 A.2d 1353, 1363 (Me.1985); *Owens–Illinois, Inc. v. Zenobia*, 325 Md. 420, 601 A.2d 633, 657 (1992); *Wangen v. Ford Motor Co.*, 97 Wis.2d 260, 294 N.W.2d 437, 458 (1980).

Punitive damages are not favored in the civil law. They carry a stigma and have the potential for economic debilitation of the defendant against whom such damages are rendered. Because the amount is left to jury discretion, punitive damages are unpredictable. In a case where a product is claimed to be defective, many customers may punish the same defendant repeatedly for the same conduct. A heightened evidentiary standard puts the fact-finder on notice that the remedy has so great a risk of harm that it should not be applied unless there is a high probability that the facts supporting the claim are true. Although punitive damages serve a valid purpose, a heightened evidentiary standard is appropriate. For these reasons, I would overrule *Menaugh* to the extent it is in conflict.

There is a secondary question as to whether a higher standard of proof is prohibited because of the legislative enactment of §§ 510.263 and 537.675, RSMo Supp. 1992 (providing for a bifurcated trial where actual and punitive damages are sought, remittitur and additur of punitive damages awards, and requiring that half such award be paid into the tort victims' compensation fund). *See Menaugh*, 799 S.W.2d at 76 (Robertson, J., concurring). These statutory provisions make no mention of the standard of proof required to establish a punitive damages claim. Prior to *Menaugh* this Court had never spoken on what standard proof was applicable in a punitive damages case. *Menaugh* was decided three years after the enactment of §§ 510.-263 and 537.675. Thus, it cannot be implied that the legislature intended by their silence to enact a particular standard of proof. Punitive damages is entirely a product of the common law as developed by the courts of this state. To the extent the common law punitive damages doctrine is not defined, limited or modified by the legislature, this Court may articulate the standards by which the doctrine will be measured and applied.

For these reasons, I fully concur in the majority opinion, but add these comments in the hope that someone will pick up on the cue and raise such issues on appeal in

the near future. Neither issue was directly addressed in this case.