Forest D. HOSKINS and Julia
Hoskins, Respondents,

v.

BUSINESS MEN'S ASSURANCE,
Defendant,

Federal–Mogul Corporation and
T & N, Ltd., Appellants,

State of Missouri, Respondent.

No. WD 61744.

Missouri Court of Appeals,
Western District.

June 30, 2003.

Motion for Rehearing and/or Transfer to
Supreme Court Denied Sept. 2, 2003.

As Modified Sept. 2, 2003.

Application for Transfer Denied
Oct. 28, 2003.

558

Louis C. Accurso, Steven D. Steinhilber, Kansas City, Edward D. Robertson, Jr., Anthony L. DeWitt, Jefferson City, for respondents.

Terry L. Karnaze, Kansas City, KS, Thomas B. Weaver, Cynthia A. Sciuto, St. Louis, for appellants.

Jeremiah W. (Jay) Nixon, Atty. Gen., James R. Layton, State Solicitor, Charles W. Hatfield, Assistant Attorney General, Jefferson City, for the State of Missouri.

Before ELLIS, C.J., and HOWARD and NEWTON, JJ.

VICTOR C. HOWARD, Judge.

Forest "Dino" Hoskins and his wife, Judy Hoskins (Plaintiffs), sued the owners of the building where Mr. Hoskins worked and the manufacturer and its successor of an asbestos-containing fireproofing material used in the building's construction for personal injuries and loss of consortium. Plaintiffs maintained that Mr. Hoskins' mesothelioma, a rare form of lung cancer, resulted from his exposure to the asbestos in the building.

A jury entered verdicts for Plaintiffs for actual and punitive damages. Manufacturer and its successor appealed to the Missouri Supreme Court, which declared section 537.675 [1] constitutional in *Hoskins v. Business Men's Assurance*, 79 S.W.3d 901 (Mo. banc 2002), and transferred the case to this court for resolution of Defendants' remaining points on appeal. Those points

---

1. Statutory references are to the Revised Statutes of Missouri (2000).

involve: (1) the submissibility of punitive damages, (2) the propriety of and prejudicial nature of Plaintiffs' closing argument, (3) the trial court's exclusion of all evidence except that of Defendants' financial condition in the second punitive damage phase of the bifurcated trial, and (4) the trial court's award of prejudgment interest on punitive damages.

For the reasons set forth below, we affirm the trial court's judgment in part and reverse that portion of the judgment awarding prejudgment interest on punitive damages.

## Factual Background

We begin with a factual background of the dispute now on appeal, viewing all facts and reasonable inferences therefrom in a light most favorable to the Plaintiffs while disregarding contrary evidence and inferences. *Lewis v. FAG Bearings Corp.*, 5 S.W.3d 579, 584 (Mo.App. S.D.1999). Where necessary, we include additional facts and evidence adduced at trial in our discussion of the issues on appeal.

The "BMA Tower," a nineteen-story office building in Kansas City, Missouri, was constructed in 1962 and 1963. As a part of that construction, "Sprayed Limpet Asbestos" (Sprayed Limpet), a fire retardant consisting of 60% asbestos fibers, 38% Portland cement, and 2% mineral oil, was applied by spraying the product on the structural steel throughout the building. Sprayed Limpet was manufactured by J.W. Roberts, Ltd., a subsidiary of Defendant Turner and Newall (T & N), which was acquired by Defendant Federal–Mogul Corporation in 1998.[2]

In September of 1978, approximately fifteen years after the BMA Tower's construction, Plaintiff Forest Hoskins began working as an operating engineer at the building. Mr. Hoskins regularly worked on the first eighteen floors in the area between the suspended ceiling tiles and the floor above, known as the "soffit area" or the "return air plenum," the height of which ranged from 2½ to 4 feet. He was responsible for installing and maintaining the electrical, heating, ventilation and air-conditioning equipment in this area. He also regularly worked on the nineteenth floor, known as the "machine" or "mechanical room." The nineteenth floor did not have a suspended ceiling and contained "all of [the building's] major air systems." The steel pipes and Sprayed Limpet were exposed throughout this floor. Each time Mr. Hoskins worked in these areas, he came in regular contact with the Sprayed Limpet material, much of which had fallen from the steel beams onto the ceiling tiles or floor, causing dusty conditions. Mr. Hoskins also sometimes had to remove portions of the still-remaining Sprayed Limpet in order to attach clamps on the steel beams to support and hold in place the electrical conduits. In addition, when installing large machinery on the nineteenth floor, he had to run wrought iron along the beams to support the machines and run all of the duct work and control circuits along the beams to the units. This, too, required him to physically remove the Sprayed Limpet from the beams.

Neither Mr. Hoskins nor the other operating engineers at the BMA Tower were told that the "Limpet" product to which they were regularly exposed, and sometimes covered in, contained asbestos until 1988 or 1989, after air quality tests in the building returned unacceptable readings of

---

**2.** The record indicates that, for purposes of this case, Defendants T & N, Ltd., and its successor, Federal–Mogul, were known collectively as "Turner and Newall" or "T & N." We also refer to them as "T & N" or "Defendants" herein.

asbestos levels.[3] Consequently, the operating engineers were required to take training classes, at which they learned the safety precautions for working in and around the Sprayed Limpet. These precautions included wearing protective equipment such as respirators and paper suits and hats that covered their entire bodies when working "up in the ceiling." They also had to build "a containment tent" around the area in which they worked, "so nothing would fall out of the ceiling and into the workspace." Prior to this training, Mr. Hoskins had never worn any sort of protective clothing or breathing apparatus and was regularly exposed to and breathed the Sprayed Limpet dust. Following the training, the operating engineers also began having annual company-provided medical exams that included pulmonary function tests and chest x-rays.

In January of 1999, Mr. Hoskins submitted to his routine medical exam. He was fifty-three at the time. After his pulmonary function and chest x-ray results raised the concerns of the testing facility about a possible disease process in his lungs, Mr. Hoskins' family doctor examined him and referred him for a CT scan. After receiving the results of the CT scan, his family doctor referred him to Dr. Hamner Hannah, a thoracic surgeon, who performed a lung biopsy on Mr. Hoskins at Menorah Hospital in the Kansas City metropolitan area. Dr. Hannah's post-operative report stated that "adhesions," or bands of scar tissue surrounded Mr. Hos-

kins' entire right lung. Dr. Hal Marshall, a surgical pathologist, diagnosed Mr. Hoskins as having desmoplastic malignant mesothelioma, a rare form of cancer associated with exposure to asbestos. Mr. Hoskins was then referred to Dr. Mark Myron, a Kansas City oncologist, for treatment of the cancer.

In early April of 1999, Dr. Myron referred Mr. Hoskins to Dr. Valerie Rusch, a thoracic surgeon at Memorial Sloan–Kettering Cancer Center ("Sloan–Kettering") in Manhattan, New York. After consultation and confirmation of Mr. Hoskins' desmoplastic mesothelioma diagnosis with a poor prognosis, Dr. Rusch determined that Mr. Hoskins was a candidate for aggressive lung removal surgery.[4] Mr. Hoskins returned to New York City at the end of April for the surgical procedure. Dr. Rusch discovered during the surgery that Mr. Hoskins had "a very early stage tumor" that required only removal of the pleura, the lining of the lung, rather than removing the entire lung. Dr. Phillip Lieberman, a pathologist at Sloan–Kettering, reviewed the twenty tissue sample slides taken during Mr. Hoskins' biopsy at Menorah and likewise diagnosed desmoplastic mesothelioma. However, he did not find any evidence of mesothelioma in the tissue samples taken during the surgery performed by Dr. Rusch at Sloan–Kettering.

At Dr. Rusch's recommendation, Mr. Hoskins received post-operative radiation

3. The evidence showed that previous air quality tests conducted in 1978 by Mark Crew, the BMA building manager, indicated that asbestos levels in the building were slightly higher than the outside air but were within the acceptable concentration levels. However, no air quality tests were performed in the soffit areas at the time. Building tenants were notified of the results, but the operating engineers were not.

4. Specifically, Dr. Rusch testified in her deposition that her "impression" at the time of Mr. Hoskins' initial consultation was desmoplastic mesothelioma, or "right malignant mesothelioma," and her recommended plan for treating that diagnosis was extrapleural pneumonectomy, which she explained, "involves removing the pleura along with the underlying lung, often a portion or all of the diaphragm and often a portion of the pericardium, which is the sac around the heart."

therapy at Research Medical Center in Kansas City. He continues to be monitored and treated by Dr. Myron. Dr. Myron testified in his videotaped deposition[5] that Mr. Hoskins' "prognosis on the basis of the diagnosis of mesothelioma remained guarded. Most of these patients have recurrence of this disease. Most, if not all. And so [he] obviously remained guarded about his prognosis, although optimistic for the short term." Dr. Myron further explained, "[g]enerally speaking, mesothelioma is considered to be a noncurable disease.... It's going to come back and eventually cause the death of a patient."

This unpredictability of his future has caused Mr. Hoskins to suffer from depression. He also continues to suffer from "severely impaired" pulmonary function and capacity. The evidence indicates his condition is not likely to improve. Due to his condition, he never returned to work as an operating engineer at BMA after his early 1999 cancer diagnosis.

### Procedural Background

On March 6, 2000, Mr. Hoskins and his wife filed suit against BMA, Federal–Mogul Corp., T & N, and TAF International, LTD.[6] They brought seven counts alleging a causal relationship between Mr. Hoskins' exposure to Sprayed Limpet and his illness:

COUNT I alleged strict liability for a defective product against T & N;

COUNT II alleged strict liability for failure to warn against all Defendants;

COUNT III alleged breach of warranty against all Defendants;

COUNT IV alleged negligent manufacture and failure to warn against all Defendants;

COUNT V alleged false representation against all Defendants;

COUNT VI alleged premises liability against BMA; and

COUNT VII alleged Mrs. Hoskins' loss of consortium claim.

In each of the seven counts, Plaintiffs prayed for "general and special" damages in addition to "punitive or exemplary" damages.

On February 26, 2001, after almost exactly a year of discovery, limine motions and a pre-trial motion hearing, the case proceeded to a jury trial on a special trial setting. On the eve of trial, Plaintiffs settled their claims against BMA for $5 million, so the parties jointly moved for the dismissal of BMA from the lawsuit with prejudice. The trial proceeded against T & N.

After voir dire and opening statements, Plaintiffs presented evidence that included: (1) their testimony, (2) their family's testimony, (3) the testimony of Mr. Hoskins' co-workers at the BMA Tower who had been similarly exposed to the Sprayed Limpet, (4) the testimony of Mr. Hoskins' supervisor at BMA, and (5) the testimony of several of Mr. Hoskins' physicians. Barry Castleman also testified as Plaintiffs' expert witness. Defendants' pre-trial attempts to bar his testimony were overruled, as were many of their objections to his specific testimony. Dr. Castleman is a self-described "environmental consultant" who earned his doctor of science degree from the Johns Hopkins School of Hygiene

---

**5.** This videotaped deposition was admitted at trial without objection.

**6.** TAF, formerly known as Turner Asbestos Fibres, Ltd., is a long defunct former United Kingdom subsidiary of T & N. Plaintiffs dismissed TAF from the suit before the case went to the jury.

and Public Health; he specializes in occupational environmental health.

The evidence showed that the bulk of Dr. Castleman's work, both during his doctoral studies in the late 1970's and as an environmental consultant, has involved dealing with asbestos as a toxic substance and its control. In 1996, after he received "tens of thousands" of T & N documents discovered during litigation against T & N, Dr. Castleman incorporated them into his earlier research. The trial court allowed him to testify about his findings in several of these T & N documents and admitted several of the documents into evidence. A large part of his testimony focused on the progression of knowledge of the health risks associated with exposure to asbestos-containing products and his belief that T & N had monitored the developing literature on the topic. We further consider this evidence below in our discussion of Defendants' allegation that the evidence was insufficient to submit Mr. Hoskins' punitive damages claim to the jury.

Defendants' evidence focused primarily on proving Mr. Hoskins did not suffer from desmoplastic mesothelioma. To this end, they presented the deposition testimony of Dr. Andrew Churg, a member of the "Mesothelioma Panel," a group of doctors with experience in diagnosing mesothelioma. Dr. Churg opined that the medical information and pathology information he reviewed in Mr. Hoskins' case, coupled with Mr. Hoskins' survival for more than two years after diagnosis, were inconsistent with desmoplastic mesothelioma. Rather, Dr. Churg opined that Mr. Hoskins suffered from a "benign mesothelial proliferation." Dr. Lawrence Repsher, who is board certified in pulmonary disease, likewise testified on Defendants' behalf that, based upon his review of the evidence provided to him, he did not believe that Mr. Hoskins suffers from mesothelioma.

The case was submitted to the jury on Plaintiffs' theories of strict liability defective design, strict liability failure to warn, negligent manufacture, and negligent failure to warn. Pursuant to Defendants' request under section 510.263, the trial court granted a bifurcated trial on the punitive damages issue. The first phase of the trial resulted in a jury verdict awarding a total of $3 million in compensatory damages ($2 million to Mr. Hoskins, $1 million to Mrs. Hoskins) and finding that Defendants were liable for punitive damages. After the second phase of the trial, at which, over Defendants' objections, the trial court limited the evidence and argument to Defendants' financial condition, the jury awarded Mr. Hoskins $7 million in punitive damages. After a hearing, the trial court entered its amended judgment overruling Defendants' post-trial motions and sustaining Plaintiffs' motions for costs, to amend or correct the judgment, and to require Defendants to file an adequate supersedeas bond.

Upon the trial court's entry of its amended judgment, Defendants' filed their appeal to the Missouri Supreme Court. As set forth above, after the supreme court decided the issue concerning the constitutionality of section 537.675, it transferred the case to this court for resolution of Defendants' remaining issues on appeal. Such resolution follows.

### Submissibility of Punitive Damages

Defendants' first two points on appeal are substantially similar and will be addressed as one. In both, they challenge the submissibility of Mr. Hoskins' claim for punitive damages.[7] They do not challenge the compensatory damages awarded by the jury.

7. Mrs. Hoskins' claim for punitive damages was not submitted to the jury.

Defendants' first point assigns error to the trial court's denial of their motion for directed verdict, its giving of the punitive damages instruction, and its denial of their motion for judgment notwithstanding the verdict on the punitive damages claim. Their second point focuses solely on the trial court's alleged error in giving the punitive damages instruction, alleging that the evidence did not support each of the disjunctive theories for recovery of punitive damages. Referring back to their arguments in Point I, they assert in Point II that if this court "finds that plaintiffs made a case on less than all three theories of recovery submitted in Instruction 12, defendants are entitled to a new trial on the issue of punitive damages."

Defendants offer the same reasoning in support of both points: They maintain Mr. Hoskins failed to present clear and convincing evidence that: (1) after application, Sprayed Limpet had a propensity to release fibers into the air; (2) Defendants had actual knowledge that the Sprayed Limpet posed a health hazard to persons like Mr. Hoskins working in the BMA Tower years after application of the material for fireproofing; or (3) Defendants knew or should have known that their sale of the Sprayed Limpet created a high degree of probability of injury to persons working in the building fifteen years after application of the product. More specifically, Defendants assert that "the narrow issue is whether plaintiffs proved, by clear and convincing evidence, that by 1963 T & N had *actual knowledge* that Sprayed Limpet was unreasonably dangerous to persons with exposure similar to Mr. Hoskins'."

As set forth below in Instruction Number 12 given to the jury, Mr. Hoskins' product liability claim for punitive damages was submitted on negligence and strict liability theories. Punitive damages are properly submitted in a negligence case only if there is clear and convincing evidence that "at the time of the negligent act, the defendant[s] knew or had reason to know that there was a high degree of probability that the action would result in injury." *Lewis*, 5 S.W.3d at 583 (citing *Hoover's Dairy, Inc. v. Mid–America Dairymen, Inc.*, 700 S.W.2d 426, 436 (Mo. banc 1985)). Punitive damages are properly submitted in a strict liability case only if there is clear and convincing evidence that Defendants "placed in commerce an unreasonably dangerous product with actual knowledge of the product's defect." *Letz v. Turbomeca Engine Corp.*, 975 S.W.2d 155, 164–65 (Mo.App. W.D.1997). Both theories also require evidence "that the Defendant showed a complete indifference to or conscious disregard for the safety of others." *Id.* at 165; *see also Barnett v. La Societe Anonyme Turbomeca France*, 963 S.W.2d 639, 659 (Mo.App. W.D.1997) (discussing the fact that "[i]n the context of products liability actions, the legal standard for submitting punitive damages depends on whether the underlying theory is in strict liability or in negligence" and explaining the submissibility standards for each). As explained in *Lewis:*

> "Conscious disregard or complete indifference" includes situations where the person doing the act or failing to act must be conscious of his conduct, and, although he has no specific intent to injure, must be conscious, from his knowledge of surrounding circumstances and existing conditions, that his conduct will naturally or probably result in injury.

5 S.W.3d at 583 (citing *Hoover's Dairy,* 700 S.W.2d at 435).

**I. Standard of Review:** We review the evidence offered at trial to determine whether, as a matter of law, it was

sufficient to submit Mr. Hoskins' claim for punitive damages. In so reviewing, we must consider the evidence and reasonable inferences therefrom in a light most favorable to Mr. Hoskins while disregarding unfavorable evidence and inferences. *J & J Home Builders, Inc. v. Hasty,* 989 S.W.2d 614, 617 (Mo.App. E.D.1999). We will not, however, "supply missing evidence or give [Plaintiffs] the benefit of unreasonable, speculative, or forced inferences." *Davis v. Board of Educ.,* 963 S.W.2d 679, 684 (Mo.App. E.D.1998). We also consider that our supreme court has cautioned:

> Submission of a punitive damages claim to the jury warrants special judicial scrutiny because the instructional standards for punitive damages are necessarily general. . . .
>
> . . . A defendant's aggressive defense at trial on either the issue of breach of duty or causation may supply, in the jurors' minds, the "complete indifference" or "conscious disregard" element. That is why careful judicial scrutiny is needed to determine whether the conduct was so egregious that it was "tantamount to intentional wrongdoing." *Lopez [v. Three Rivers Elec. Coop.,* 26 S.W.3d 151, 160 (Mo. banc 2000)]. Moreover, the conduct must be such that injury is its "natural and probable consequence." *Id.*
>
> The remedy of punitive damages is "so extraordinary or harsh that it should be applied only sparingly." *Rodriguez [v. Suzuki Motor Corp.,* 936 S.W.2d 104, 110 (Mo. banc 1996) ].* The remedy is, after all, imposed as punishment for and deterrence of bad conduct.

*Alcorn v. Union Pac. R.R. Co.,* 50 S.W.3d 226, 247–48 (Mo. banc 2001).

**II. Punitive Damages Instruction:** The issue of punitive damages was submitted to the jury in Instruction Number 12 as follows:

If you find in favor of plaintiff Forest D. Hoskins under Instruction Number *9,* [which submitted Defendants' liability for negligent manufacture and negligent failure to warn,] and if you believe that:

First, at the time defendant Turner and Newall manufactured the Sprayed Limpet, defendant Turner and Newall knew the Sprayed Limpet contained asbestos which could cause lung disease when people were exposed to it, and

Second, defendant Turner and Newall knew or had information from which defendant Turner and Newall, in the exercise of ordinary care, should have known that such conduct created a high degree of probability of injury, and

Third, defendant Turner and Newall thereby showed complete indifference to or conscious disregard for the safety of others, or

If you find in favor of plaintiff Forest D. Hoskins under Instruction Number *7,* [which submitted Defendants' strict liability for product defect,] and if you believe:

First, at the time defendant Turner and Newall manufactured the Sprayed Limpet, defendant Turner and Newall knew of the defective condition and danger submitted in Instruction Number *7,* and

Second, defendant Turner and Newall thereby showed complete indifference to or conscious disregard for the safety of others, or

If you find in favor of plaintiff Forest D. Hoskins under Instruction Number *8,* [which submitted Defendants' strict liability for failure to warn,] and if you believe:

First, at the time defendant Turner and Newall manufactured the Sprayed

Limpet, defendant Turner and Newall knew of the danger submitted in Instruction Number *8,* and

Second, defendant Turner and Newall thereby showed complete indifference to or conscious disregard for the safety of others,

then in Verdict *A,* you may find that defendant Turner and Newall is liable for punitive damages.

If you find that defendant Turner and Newall is liable for punitive damages in this stage of the trial, you will be given further instructions for assessing the amount of punitive damages in the second stage of the trial.

Defendants' inverse instruction was given in Instruction Number 13.

Pursuant to the Missouri Supreme Court's decision in *Rodriguez,* 936 S.W.2d at 111, which held that evidence must meet the clear and convincing standard of proof on all claims for common law punitive damages, Instruction Number 4 instructed in relevant part, "[t]he burden is upon plaintiff to cause you to believe that the evidence has clearly and convincingly established the propositions of fact required for the recovery of punitive damages as submitted in Instruction Number *12."*

■ **III. Discussion:** The "clear, cogent and convincing" standard of proof established in *Rodriguez* requires evidence "which instantly tilts the scales in the affirmative when weighed against evidence in opposition; evidence which clearly convinces the fact finder of the truth of the proposition to be proved." *Lewis,* 5 S.W.3d at 582–83. Thus, we consider whether the evidence offered by Mr. Hoskins at trial and inferences therefrom, when viewed in a light most favorable to Mr. Hoskins, clearly and convincingly establishes that by 1963, when construction of the BMA tower was completed, T & N had actual knowledge that Sprayed Limpet was unreasonably dangerous to persons with exposure similar to Mr. Hoskins' exposure at the BMA Tower.

**A. Mr. Hoskins' Evidence:** Mr. Hoskins highlights the following evidence in support of his claim for punitive damages:

**1. Dino Hoskins' Exposure:** Mr. Hoskins and other operating engineers or maintenance personnel at the BMA Tower testified that they regularly worked above the ceiling barrier, in the soffit areas, and on the nineteenth floor mechanical room at the BMA Tower. Within these spaces, the operating engineers came into regular contact with the Sprayed Limpet, much of which had come loose and fallen onto the ceiling tiles or floor areas. Their duties also required them to remove the Sprayed Limpet from the steel beams in order to repair or replace electrical, plumbing and HVAC components. They did so without any knowledge that the product contained asbestos. Thus, they wore no protective clothing or respirators and took no other special precautions in working with the material until they attended training in 1988 or 1989, during which they learned of the dangers of Sprayed Limpet.

**2. The History of Asbestos Dangers:** Plaintiffs' expert, Dr. Barry Castleman, is an environmental consultant who "deal[s] with toxic substance and control." The focus of his doctoral studies and much of his work is related to the asbestos industry; his doctoral work is compiled in his book entitled "Asbestos: Medical and Legal Aspects," which he first published in 1984. Dr. Castleman explained that he was compelled to publish the fourth and most current 1996 edition of his book after attorneys for Chase Manhattan Bank discovered in a lawsuit it had filed against T & N, and provided to him, "tens of thousands" of T & N documents relating to asbestos.

Plaintiffs traced the history of the generally known dangers of asbestos through his testimony and the related admitted exhibits. This history included the following:

### a. General Knowledge:

A sprayed asbestos product has been known to be a mortal hazard since the 1930's.

Even before the diagnoses of asbestosis, a chronic, lung scarring condition linked to asbestos exposure, and mesothelioma, the rare form of lung cancer also linked to asbestos exposure, in the 1920's, American life insurance companies, as a general practice, declined asbestos workers "on account of the health injurious nature of their occupation" because of a high incidence of lung conditions among asbestos workers.

By the early thirties, when the asbestos industry began to rapidly grow in the United States, asbestosis cases were being reported not only in asbestos workers at asbestos mines and factories, but also in users of asbestos insulation products. This includes cases reported among insulation workers and a boiler riveter in 1933 and 1934.

In 1930, Dr. Merewether, a British factory inspector, documented the delayed onset of asbestosis amongst the workers and stressed the need for respiratory protection when working around asbestos. This report, and other early annual reports of the chief inspector of factories in England, chronicled the occurrence of lung disease in workers exposed to asbestos and the efforts to control dust in asbestos factories. The reports referred to asbestos as an extremely dangerous material.

In the mid 1930's, reports started appearing diagnosing lung cancer in addition to asbestosis.

Pennsylvania health officials, in a 1935 published study in which they compared the workers' levels of exposure and incidents of asbestosis, concluded that they were not able to recommend any level of exposure to asbestos as being free from risk.

As early as 1943, Dr. Wetler, a German pathologist, published an article designating mesothelioma as an asbestos disease. An abstract or summary of the article was subsequently published in England. The German government recognized lung cancer as an occupational disease of asbestos workers in 1943 under national law.

In 1949, Dr. Wires of Cape Asbestos, "the other big asbestos company in England besides [T & N]," reported a case of what he called endothelioma of the pleura, which Dr. Castleman explained is another way doctors described mesothelioma in the history of the disease.

Beginning in 1950, the British government began publishing statistical documentation showing an increased risk of lung cancer from asbestos exposure.

**b. T & N–Specific Evidence:** Also included in the historical evidence documented by Dr. Castleman was evidence linked specifically to T & N:

In 1924, Dr. W.E. Cook, a pathologist, reported the case of Nellie Curshaw, an employee of one of T & N's European companies since the age of thirteen, who died of asbestosis at the age of thirty-three. Her case was ultimately written up in the British Medical Journal that year.

Dr. Castleman also testified concerning a chart in his book entitled "Mesothelioma at T & N Companies in Britain,"

which traces, from T & N's historic records, the individual files of T & N asbestos workers with mesothelioma or similar lung diseases or conditions. The records identified several T & N workers who had died of endothelioma and other similar cancers of the pleura and peritoneum "where asbestos mesotheliomas occur." This included John Scoura, who worked as a goods loader (end-product exposure) and was diagnosed with endothelioma of the pleura in 1946.

Plaintiffs' Exhibit 86 is a letter dated March 27, 1956, also taken from T & N's own documents. This letter is addressed to "Mr. Jones" at T & N from its solicitor (attorney) about an employee's claim that his 1954 diagnosis of pneumoconiosis resulted because he "had not been sufficiently protected against the danger of inhaling foreign matter." The letter discusses the employee's rapidly declining health and then states, "If the man does not survive then there will be obvious difficulty in establishing any claim in negligence because in all cases of this kind the man's own personal evidence is vital." The letter ends with a recommendation to "have the man examined by an experienced Consultant Physician who can also investigate the case at Hospital and obtain a detailed case history."

Defendants were aware of substitutes for asbestos in sprayed insulation such as mineral wool or granulated rock wool by 1957. But, according to Dr. Castleman, T & N's internal documents indicated that they would not be able to obtain patent protection for the substitute product, and it would reduce the market for the sale of asbestos and Sprayed Limpet. Thus, he explained that "despite the knowledge of the dangers of sprayed asbestos, [Defendants]

did not take steps to employ the asbestos substitutes for profit reasons."

After a visit to the United States for a medical conference in New York in 1960, Dr. John Knox, T & N's medical director, reported on a paper presentation given at the conference by Dr. Webster on "Mesotheliomatous Tumors" in connection with asbestos exposure in South Africa. Dr. Knox concludes his report on the paper by saying that "the lesson to be learned is clear. There is a hazard in the dissemination of asbestos and other dusts and the possibility of others as well as the workers immediately concerned becoming involved should always be considered." The report also indicates that Dr. Knox met with the president of Keasby & Mattison (a T & N United States subsidiary) concerning "the way they were dealing with abnormal chest x-rays among their workers." In addition, Dr. Knox reports back to T & N that "[t]he legislative framework under which industries operate in the U.S.A. makes it difficult for us here to follow the lines of thought which prompt action over there in the matter of standards of industrial practice. In many industries the employers seem so far in front of legislation as to have created a special code of practice for themselves. In other industries, such as coal mining, the difficulties in improving conditions are so great that industrial practice lags behind legislation. The special problem posed by dust inhalation which may have effects many years after would seem to demand a forward looking approach."

A 1960 article by Dr. J.C. Wagner in the British Journal of Industrial Medicine, in which he also detailed mesothelioma case studies in South Africa, reported on a case involving a connection between mesothelioma of the pleura and "the removal of asbestos lagging from old pipes

[which] created a very dusty atmosphere." This report was discussed by members of the "Asbestosis Research Council," of which Dr. Knox of T & N was an "Executive Member of Research Committee."

Defendants' own expert, Dr. Lawrence Repsher, testified that the asbestos manufacturers "have known for a long time that inhaling asbestos fibers in significant concentrations over a period of time, no matter how they get into the air, [is] dangerous."

Another of the T & N internal documents discovered by Dr. Castleman and detailed in his book was a July 25, 1962, T & N internal memorandum ("**the 1962 T & N Memo**").[8] In this memo, Alexander Marshall, who Dr. Castleman testified "was about to become the managing director of J.W. Roberts, the company that manufactured the Sprayed Limbet," wrote:

*"The awkward thing about this is that even if we succeed in perfecting a way of applying the material by dustless and 'safe' method (and that is a big "if"), we are still liable to come unstuck according to Mr. Smith when somebody eventually comes in to remove the asbestos. I cannot see much hope of rendering this 'safe' from a health point of view so that reliance would still have to be put on protective measures."* (Emphasis added.)

**B. Defendants' Argument:** As set forth above, Defendants argue that the issue is whether Plaintiffs presented clear

and convincing evidence that as of the date of manufacture—no later than 1963—T & N had actual knowledge that, after application, Sprayed Limpet was unreasonably dangerous to the class of persons of which Mr. Hoskins was a member. Defendants insist that "[a]lthough these documents [relied upon by Plaintiffs] reflect developing information regarding pulmonary diseases among mining, manufacturing, and insulation workers" and the health risks associated with certain types of asbestos exposure in the 1950's and 1960's, "none contain reports or discussions of any health hazards associated with exposure to finished in-place asbestos product or any information suggesting that Sprayed Limpet released asbestos fibers into the air years after its application."

Defendants rely primarily upon the cases of *Kansas City v. Keene Corp.*, 855 S.W.2d 360, 375 (Mo. banc 1993) (explaining that "[e]vidence of a generalized knowledge that asbestos poses a danger to a narrow class of unprotected persons who are exposed during the application or removal of asbestos-containing materials in buildings will not, under the strict requirements for a submissible punitive damages case, support an inference that plaintiffs had knowledge of a danger to the much broader class of persons who were merely present in such buildings at other times"); *Angotti v. Celotex Corp.*, 812 S.W.2d 742, 747 (Mo.App. W.D.1991) (discussing the level of scientific knowledge sufficient to establish legal causation and how the evidence relates to the class of persons known to be in danger, because "there are

---

**8.** The record indicates that the contents of this memo came into evidence through Dr. Castleman's testimony. As he read from the portion of his book setting forth the memo, that portion was also being displayed by projection to the jury. Defendant's objections to his testimony concerning the memo were overruled. Later, prior to closing argument, the trial court again indicated that it would allow Plaintiffs to display "exactly what was read to the jury"—the contents of the memo as set forth in Dr. Castleman's book.

many products and environmental conditions that are known to create a health hazard to individuals exposed to a given degree which do not create a hazard to one exposed to a lesser degree," in holding that the evidence did not support the submission of plaintiff's punitive damages claim); *Sch. Dist. of Independence v. U.S. Gypsum Co.*, 750 S.W.2d 442, 446 (Mo. App. W.D.1988) (discussing the lack of evidence tending to prove the defendant's actual knowledge of its asbestos-containing product's "propensity to release asbestos fibers" in affirming the trial court's judgment notwithstanding the verdict on the issue of punitive damages); and *also Alack v. Vic Tanny Int'l of Mo., Inc.*, 923 S.W.2d 330, 338–39 (Mo. banc 1996) (citing *Keene* for "the type of knowledge or evil intent that must be established in connection with a claim of conscious disregard or complete indifference for an award of punitive damages" and explaining that "[a] vague and generalized knowledge of danger is insufficient. The evidence must show that, at the time of the act complained of, the defendant had knowledge of a high degree of probability of injury to a specific class of persons." The court found plaintiff's proffered punitive damages instruction insufficient for failure to include the necessary element of knowledge.). Defendants insist that the evidence before the jury relating to knowledge of asbestos exposure hazards in the industry during the relevant time period was too vague and generalized. They further maintain that all of the evidence involved a level or type of asbestos exposure significantly different than that claimed by Mr. Hoskins and/or the effects of exposure to a different class of persons than that to which Mr. Hoskins belonged.

■ **C. Conclusion:** We do not feel it is necessary to delve further into the numerous arguments advanced by Defendants to counter the evidence relied upon by Mr. Hoskins in support of submission of his punitive damages claim. Our standard of review requires us to review the evidence in a light most favorable to Mr. Hoskins and disregard contrary evidence or inferences. Moreover, each case evaluating the sufficiency of the evidence to submit punitive damages is largely dependent upon the facts of the particular case. In fact, as a premise to the holding in *Angotti* that the evidence, *in that case*, was insufficient to warrant submission of plaintiff's punitive damages claim against the defendant, this court cautioned:

> This is not to say that punitive damages would not be recoverable when there is evidence to show that a defendant had been put on notice of the fact that relevant information in regard to the dangerousness of the product was available to show that the product was actually known to constitute a health hazard to a given class of individuals and the defendant consciously chose to ignore the available information.

812 S.W.2d at 746. We find that Mr. Hoskins presented precisely such evidence, which culminated with the 1962 T & N Memo.

As emphasized above in our discussion of the T & N-specific evidence offered by Plaintiffs in support of their claim for punitive damages, Mr. Marshall, a T & N executive, expressly warned in the 1962 T & N Memo that "even if we succeed in perfecting a way of applying the [Sprayed Limpet] by dustless and 'safe' method *(and that's a big 'if')*, we are still liable to come unstuck according to Mr. Smith when somebody eventually comes in to remove the asbestos." (Emphasis added.)

This is more than just the generalized knowledge evidence found to be insufficient in *Keene* and *Angotti, supra.* The evidence clearly indicates that T & N knew of the unreasonably dangerous defect of Sprayed Limpet. It also supports the conclusion that Defendants had actual knowledge of a danger to those such as Mr. Hoskins who were required to work around and remove the Sprayed Limpet. Likewise, the evidence was also clear and convincing that Defendants knew or had reason to know that in 1962, when the Sprayed Limpet was being applied at the BMA Tower, there was a high degree of probability that their continued sale of the asbestos-containing Sprayed Limpet would result in lung disease when persons like Mr. Hoskins were exposed to it. *See, supra,* our discussion concerning the legal standards for the submissibility of punitive damages in strict liability and negligence claims.

Further, Mr. Marshall continues in the memo, "I cannot see much hope of rendering this 'safe' from a health point of view so that reliance would still have to be put on protective measures." Yet, Defendants still sold the Sprayed Limpet used in the BMA Tower's construction during 1962 and 1963, and no such "protective measures" were put in place until after Mr. Hoskins had suffered years of exposure to the product, whether it be via the dust from the product or due to the necessity that he physically remove the product from the pipes from time to time. This provides the necessary clear and convincing evidence for the jury to find that the Defendants showed a complete indifference to or conscious disregard for the safety of others. *See, supra,* our discussion concerning situations in which the required showing of a defendant's complete indifference or conscious disregard for the safety of others will be found.

Defendants attempt to minimize or eliminate the damage of the 1962 T & N Memo in two ways:

First, they claim that the inclusion of the memo in Dr. Castleman's book is merely "Castleman's vague characterization of an unproduced document that refers to an unidentified person's opinion without context or explanation," so it is not clear and convincing evidence of the requisite knowledge of T & N. We disagree. That "Mr. Smith" is not identified does not lessen the memo's impact in proving that T & N knew of the dangers associated with Sprayed Limpet. Second, although Defendants objected at trial and now attempt in the argument portion of their brief to discredit the memo by challenging its reliability and/or admissibility, alleged error in its admission is not included in their point on appeal and will not be considered. Rule 84.04(e). Even if the issue was preserved, their arguments are directed at the weight to be afforded to the evidence, which is a matter properly left to the jury.

Viewed in a light most favorable to the Plaintiffs, as we must view it on review of the submissibility issue, the memo provides clear and convincing evidence of the requisite knowledge to allow for submission of punitive damages to the jury. This court will not reweigh the evidence.

Second, Defendants continue to insist that there was no evidence placing Mr. Hoskins in the class of persons known to be in danger. They argue that, at most, the 1962 T & N Memo is an "oblique reference to asbestos removal," and there was no evidence that Mr. Hoskins *routinely* removed the products so that he would be in that class of workers. But, the memo does not say "routine" removal or limit its scope to workers in the asbestos removal industry, if such industry even existed at the time the memo was written. Viewed in the light most favorable to Mr.

Hoskins, the memo indicates that, however the asbestos is removed, it is not safe. That building maintenance personnel would have to remove the product as a part of their duties is reasonably foreseeable, and the evidence showed that Mr. Hoskins did, in fact, remove the Sprayed Limpet from the pipes as a part of his duties as an operating engineer at the BMA Tower. Thus, Mr. Hoskins was within the class of persons known to be in danger.

The trial court did not err in submitting the punitive damages issue to the jury.

### Plaintiffs' Final Closing Argument

In their third point on appeal, Defendants attack Plaintiffs' final closing argument. Specifically, Defendants allege in Point III of their brief:

The trial court erred in refusing to declare a mistrial, in refusing to reopen the evidence or allow additional argument, and in denying Defendants' motion for judgment notwithstanding the verdict or, in the alternative, for a new trial because Plaintiffs' closing argument was improper and prejudicial in that: (1) Plaintiffs' counsel, for the first time in his final closing argument to the jury, argued that Defendants hid and withheld relevant evidence from their experts when (A) the parties had entered into a stipulation under the terms of which Plaintiffs' counsel were to obtain and provide all available medical slides to Defendants; (B) Defendants provided to their experts all slides they had received from Plaintiffs' counsel pursuant to the stipulation; and (C) there was no evidence that Defendants had withheld additional slide evidence; and (2) Plaintiffs' final closing argument

left the jury with the erroneous impression that defense counsel had knowingly and willfully withheld key evidence from their experts and that defense counsel had attempted to mislead the jury through tainted expert testimony, which inflamed the jury and prejudiced the Defendants in the jury's deliberations on liability and damage issues.

**Background:** To resolve this dispute concerning Plaintiffs' final closing argument, we examine its background:

Defendants' chief theory at trial was that Mr. Hoskins did not suffer from desmoplastic mesothelioma. To that end, they presented the deposition testimony of Dr. Andrew Churg,[9] who came to this conclusion after reviewing six pleural tissue slides from Mr. Hoskins' pleural biopsy, performed on February 16, 1999, at Menorah Medical Center in Kansas City, and seventeen tissue slides taken during the April 27, 1999, surgery at Sloan–Kettering. During a portion of Defendants' closing argument, they reiterated Dr. Churg's credentials and findings and reminded the jury:

I remember, Dr. Churg challenged plaintiffs' counsel[, "]No, I'm completely neutral in this case. If you've got something you want me to look at, put it in front of me. But, I'm just telling you that the evidence in this case right now is that this man never had and does not have a desmoplastic mesothelioma[."] ... All we can show about him, again, is numbers.

How about some substance? I think it's a little hard to take on a peer reviewer for the New England Journal of Medicine, so we'll let the substance sit. Okay.

---

**9.** Due to technical difficulties experienced by Defendants at trial, they opted to play a short portion of Dr. Churg's videotaped deposition for the jury "so that [the jury would] be acquainted with the witness," and then read the remaining portion.

Defendants' closing continued. After it was complete, Plaintiffs began their final closing argument by reminding the jury of Dr. Repsher's, another of Defendants' experts, testimony on cross-examination in response to Plaintiffs' questioning concerning an expert's opinion being dependent upon the facts he considered; Dr. Repsher replied something to the effect that "your opinions are only as good as the material that you're looking at." Plaintiffs used this point as a segue to the following argument:

So, why was it, why was it that I asked him those questions? Here's the substance. Dr. Churg's science is seriously, hopelessly, and fatally flawed. The question you get to answer is why did the defendants allow that to happen? ... Why would they bring that sort of flawed science and stick it in front of our nose and expect us to buy it?

Plaintiffs continued by highlighting the fact that Dr. Lieberman's testimony and records show he had reviewed *twenty* tissue slides from the pleural biopsy performed at Menorah Hospital in addition to the seventeen slides from Sloan–Kettering. But, Dr. Churg's deposition testimony showed that he had only reviewed *six* slides from Menorah and seventeen slides from Sloan–Kettering before concluding that Mr. Hoskins did not suffer from mesothelioma and that he did not know how many slides Dr. Lieberman had reviewed.[10] Plaintiffs reasoned:

Well, she[, defense counsel,] said it. She said the issue in this case is whether Dino Hoskins has mesothelioma. Then why didn't they give him the 14 other slides? Why didn't they show him the 14 slides? What are they trying to hide? Why wasn't that brought out? Why didn't they talk about that? Why didn't they show it to this fellow that's supposed to be the world's greatest, world's greatest expert? The numbers don't add up, she's right. The numbers don't add up.

The doctors that tried to save Dino's life and have tried to extend his life, they looked at all of it. And they didn't show it to him or he didn't see it. One or the other. Either he didn't get it or he didn't look at it. Either way, that's where the tissue is that shows it's mesothelioma.

And remember Dr. Hannah said I took a generous biopsy. He took a lot of tissue. But Dr. Churg, for some strange reason, didn't get to look at 14 of the 20 slides. You go upstairs when you deliberate in this case and you ask yourselves why, why are they doing this?

Continuing, Plaintiffs' counsel referred to Exhibit 103 and argued that it showed Defendants had a history for not liking what one doctor said and seeking another doctor to obtain the results they wanted.[11] They argued:

10. Dr. Churg also testified that he had never spoken with Dr. Lieberman or any of the other surgeons or diagnosing pathologists in Mr. Hoskins' case because "it's not a sort of conversation that in [his] opinion [was] going to lead to the discovery of useful information."

11. Plaintiffs' Exhibit 103 is the 1960 report from John Knox, T & N's medical director, detailed in our description of the evidence in support of punitive damages. The part of the

report detailing his meeting with the president of Keasby & Mattison to discuss how that T & N subsidiary was dealing with abnormal chest x-rays among its workers indicates that Keasby & Mattison's medical adviser's opinion was "that the Radiologist who had reported on x-rays taken for the Company in recent years had been unduly favorable to the worker[.] [S]ince [then] another Radiologist ha[s] reported on the films fewer abnormalities, which could be related to dust exposure, were encountered."

Maybe they just didn't like the opinions of Dr. Lieberman and the other six doctors that are trying to save Dino Hoskins' life. So they found another doctor to look at some of the evidence. It's obvious. It's the same thing they have been doing since 1924. They don't give you the truth. They don't give you all the evidence and they expect you to just sit there and accept it. What they've done is obscene.

Defendants did not object to the argument, and Plaintiffs continued with their remaining final argument on different issues.

Once argument was complete, the case was submitted, and the jury had retired for deliberations, defense counsel announced that she had "several mistrial motions," the first of which involved their complaints about Plaintiffs' final closing argument concerning the slides. The following discussion occurred out of the jury's presence:

[DEFENSE COUNSEL]: Your Honor, the slides. We got the slides from plaintiff. If things were held back, we didn't hold anything back. There's a stipulation regarding the chain of custody on these slides that were obtained by [Plaintiffs'] law firm. If something was held back, I didn't hold it back. His office held it back. And I think that's absolute mistrial material to make it look like I'm hiding something from my expert witness when I got it from them.

[PLAINTIFFS' COUNSEL]: We didn't hold anything back.

[DEFENSE COUNSEL]: Fine. Let's go in front of the jury again and we'll—

THE COURT: No. We won't go in front of the jury again. You will argue that and put on evidence if you want to at a motion for new trial. To that extent, because there is a question of fact, I will take that under advisement and rule on

it at the time of the motion for new trial, if, in fact, we have a verdict.

The jury returned for deliberations the following day, during which defense counsel lodged continuing complaints concerning Plaintiffs' final closing argument in a conference with the trial court in chambers. Defense counsel informed the trial court that it felt Plaintiffs' counsel had committed misconduct by knowingly making a false statement to the jury. Specifically, counsel argued that Defendants "believe[d], in [their] collective memory, [ ] that [Plaintiffs' counsel] accused [them] of destroying—by '[them]' I mean the lawyers who were working with Mr. Hoskins' tissue slides—of destroying some of them. And knowing that to be a false statement, still made that statement to the jury." Defendants requested either "curative action" that would involve reopening the case "on the sole issue of whether or not these slides were destroyed," or a mistrial, "because it is a blatantly false statement in violation of two or three code sections, rule sections."

Plaintiffs' counsel replied:

I'd like to point out from the get-go that we gave the defense every piece of evidence that we had regarding these tissue slides. They had medical authorization, unrestricted, to get access to Mr. Hoskins' medical records at any time they wanted....

Their experts reviewed all the medical records pointed out—Dr. Churg pointed out in his report ... that he only looked at six slides from Menorah Hospital. And Dr. Churg, in his deposition, ... reiterated that. And he then stated he doesn't know how many slides that Dr. Lieberman looked at.

And what I said was in closing argument, my memory of it, is that they claim they gave these slides to the doctor, why didn't they give him the rest of

them. If there's other slides, why didn't they get them? And I'll point out in the transcript of defense counsel's opening statement, she said after the lawsuit was filed that Turner and Newall spent some time in obtaining those slides. Well she's put the burden on her own to get those slides.

What I argued was absolutely fair comment on what was in the evidence in this case and the reasonable inferences therefrom.

There was no objection at the time it was made. So assuming, arguendo, there was something objectionable about it, they did not give this Court an opportunity to cure anything. That's been their *modus operandi* throughout this trial. That whenever they've got a gripe or an objection, it's always, with one or two notable exceptions, been long after things have happened. If they have got an objection, they need to make an objection at the time they want to raise the issue. Not minutes or hours later.

Defense counsel responded, "Your Honor, everything [Plaintiffs' counsel] said about his closing statement was proper. All that was proper argument. What he didn't say was that he accused us of destroying slides, destroying evidence and that's not appropriate, proper or professional comment to make without evidence." Despite Plaintiffs' counsel's insistence that he had not argued that Defendants "destroyed" the slides, defense counsel reiterated the request to reopen the evidence "to show just that they were destroyed or not destroyed, just on that sole issue." The trial court responded, "[t]he jury has been in deliberation last night and this morning and that motion will be overruled." The court also overruled Defendants' motion for mistrial and informed counsel to include the issue in a motion for new trial. The court then allowed defense counsel to

put on an offer of proof consisting of evidence showing what slides Plaintiffs had provided them as a result of the stipulation the parties entered on November 1, 2000, concerning the slides.

Defendants included the issue in their motion for new trial, and the trial court overruled the motion.

■ **Discussion:** First, we note Defendants' lack of objection to the allegedly improper closing argument at the time of the argument. Instead, Defendants waited until after the case had been submitted and the jury was sent to deliberate to complain of the allegedly improper argument. It has long been held that failure to properly object to an argument at the time it is made to the jury results in a waiver of any right to complain of the argument on appeal. *Henderson v. Fields*, 68 S.W.3d 455, 470 (Mo.App. W.D.2001) (explaining that "[t]he rationale for the rule [requiring a timely and sufficient objection to closing argument so that the trial court can take corrective measures to remove the prejudice] is that not every indiscretion during closing argument warrants the drastic remedy of a mistrial."). Defendants, however, rely on *Holtz v. Daniel Hamm Drayage Co.*, 357 Mo. 538, 209 S.W.2d 883, 887 (1948) and its citation to *London Guarantee & Accident Co. v. Woelfle*, 83 F.2d 325, 343 (8th Cir.1936) in support of their contention that their objection could properly be made at the conclusion of the offending argument.

We disagree with Defendants' argument and reliance upon *Holtz* and *Woelfle* for two reasons: First, Defendants did not object at "the conclusion" of the offending argument as they claim; rather, they waited until after the case had already been submitted and the jury sent to deliberate to bring the matter to the trial court's attention. Second, Defendants' argument is incompatible with the circumstances of

this case. In a conference with the court just prior to closing arguments and outside of the hearing of the jury, the following exchange occurred between defense counsel and the court:

> [DEFENSE COUNSEL]: Your Honor, in the interest of not chopping up [Plaintiffs' counsel]'s closing argument on rebuttal, we want to know now if we can lodge a continuing objection to anything that exceeds the scope of rebuttal or if we will need to address those point by point during the closing argument?
>
> THE COURT: What rebuttal?
>
> [DEFENSE COUNSEL]: During his rebuttal on closing, if he exceeds the scope of rebuttal, would you like us to object at that time or can we lodge a continuing objection to anything which would exceed the scope?
>
> THE COURT: No. You will approach the bench because I don't want any mistakes made. If he does, you approach the bench and tell me.

Accordingly, it is clear from the trial court's forewarning that Defendants were fully aware of their requirement to make objections contemporaneous with any part of Plaintiffs' final closing argument they deemed objectionable, but they failed to do so. In other words, the trial court made it known that Defendants were not to sit on an objection until the argument was complete, and, yet, such behavior is exactly what Defendants advocate as acceptable on appeal. Defendants' failure to timely object left the trial court with only extreme options to address the alleged error: (1) it could declare a mistrial, "a drastic remedy ... [that is a decision] largely within the discretion of the trial court," *Cole ex rel. Cole v. Warren County R–III Sch. Dist.*, 23 S.W.3d 756, 759 (Mo.App. E.D.2000); (2) it could reopen the case to allow Defendants to rebut Plaintiffs' final closing argument concerning the slides; or (3) it could grant a new trial or judgment notwithstanding the verdict. The trial court refused all of the above.

Although the parties set forth various arguments concerning what occurred at the trial level, who was to do what, whether the issue was preserved, etc., the controversy boils down to whether Plaintiffs' final closing argument warranted such extreme measures be taken by the trial court.

As set forth above, Defendants argued in closing that their experts, who were "the finest in the world," had concluded that Mr. Hoskins did not have mesothelioma, and "nobody [was] attacking the science of these gentlemen." In their final closing argument, Plaintiffs did just that by pointing out that Dr. Churg did not review all of Mr. Hoskins' slides.

Defendants insist that Plaintiffs' rebuttal argument was improper because Plaintiffs were obligated to provide all of the slides to them. They contend that Plaintiffs wrongfully withheld this improper argument concerning the slide discrepancy until their final closing argument, to which they knew Defendants would not have an opportunity to respond, and the court thereafter erred in not allowing the evidence to be reopened to allow Defendants the opportunity to point out to the jury that Plaintiffs withheld the slides, not Defendants. In support of their argument that Plaintiffs were obligated to obtain "all" of Mr. Hoskins' slides and provide them to Defendants, Defendants rely upon the following stipulation entered into between the parties on November 1, 2000:

> It is hereby agreed and stipulated to that any and all tissue samples removed from the person of Forest D. Hoskins ... including and not limited to original slides, recut slides, tissue blocks or frozen sections in the possession and/or control of Memorial Sloan–Kettering

Cancer Center and Memorial Hospital for Cancer and Allied Diseases relating to his surgery on April 27, 1999, and for which a report was issued labeling these tissue samples as S99–12849, be released to [Plaintiffs' law firm].

It is further agreed and stipulated to that these tissue samples will be made available at the same time to all parties to this lawsuit (or their representatives).

It is further stipulated and agreed to that these tests may involve the destruction of some of this material and that these samples shall not be used in their entirety by any party.

A close reading of this stipulation and the surrounding circumstances contradicts Defendants' argument and leads to our conclusion that Plaintiffs' final closing argument concerning the slides was a fair response to Defendants' argument that their expert found no evidence of mesothelioma in Mr. Hoskins' case and no one had challenged that.

Defendants insist that the stipulation "expressly addressed 'any and all tissue samples.'" But, they disregard the fact that this initial coverage statement is then qualified and encompasses only the *Sloan–Kettering* slides *"relating to [Mr. Hoskins'] surgery on April 27, 1999,* and for which a report was issued labeling these tissue samples as *S99–12849."* (Emphasis added.) Apparently, Sloan–Kettering would not release those slides with only a general medical release, so the parties agreed to the stipulation authorizing Sloan–Kettering to release the requested slides to Plaintiffs' counsel, who would then provide them to Defendants. In contrast, the fourteen slides at issue that were referred to by Plaintiffs in their final closing argument were those taken during Mr. Hoskins' biopsy performed on February 16, 1999, at Menorah Medical Center in Kansas City, which were identified by the label number SP99–04622; these were not the Sloan–Kettering slides particularly identified in the stipulation. True, as Defendants point out in their brief, Sloan–Kettering "assigned its own 'Accession #'" of S99–10200 to the twenty Menorah slides, but this number still varies from that covered by the stipulation. The stipulation that required Plaintiffs' counsel to provide slides they obtained from Sloan–Kettering to Defendants related only to the tissue slides from the surgery performed on Mr. Hoskins at Sloan–Kettering in April, which slides were identified in the report by label number S99–12849. Plaintiffs fulfilled their obligation under the stipulation by providing those slides to Defendants. Although Plaintiffs also provided six of the slides they had obtained from Menorah to Defendants on November 20, 2000, the stipulation created no obligation to do so.

Both the medical reports available to Defendants and Dr. Lieberman's deposition testimony clearly reference the existence of *twenty* Menorah slides, which Dr. Lieberman explained he examined to confirm the preliminary desmoplastic mesothelioma diagnosis. This deposition was taken just five days after Dr. Churg had testified in his deposition that he reviewed *six* Menorah slides. When Plaintiffs provided only six of the Menorah slides, which is all they claim to have obtained, Defendants should have recognized the discrepancy and made sure Dr. Churg was given the remaining fourteen slides from Menorah. Perhaps Defendants relied upon Plaintiffs to provide the Menorah slides, but this misplaced reliance on the stipulation and the fact that Dr. Churg had not reviewed all of the slides does not make Plaintiffs' argument improper.

■ Defendants also complain that Plaintiffs' counsel waited to raise the issue of the slides until his final closing argu-

ment, so Defendants would not have any opportunity under the rules to respond. They suggest that Plaintiffs were obligated either: to mention the additional slides at Dr. Churg's deposition when Dr. Churg asked, "if you can show me something that looks like a mesothelioma, maybe I would change my mind"; or to inform defense counsel of the matter prior to trial; or to raise the issue in their initial closing argument. Defendants seek to place the burden on Plaintiffs and claim that "[s]itting mute while in the possession of that information was not an option in light of the stipulation between the parties." However, Defendants cite no cases placing such a burden on Plaintiffs or forbidding such trial strategy, and the stipulation placed no such burden on Plaintiffs. Dr. Churg was Defendants' expert; they were responsible for preparing him.

In summary, Defendants argued in their closing that their expert Dr. Churg found no evidence of mesothelioma and that such astute findings, or lack thereof, were not challenged. In response, Plaintiffs pointed out that Defendants' expert Dr. Churg had not reviewed fourteen of the tissue slides from Menorah; counsel inferred that this happened either because Defendants "did not show [those slides] to him" or Dr. Churg "did not see [them]." Plaintiffs used this inference from the evidence to show that Dr. Churg's opinion was scientifically flawed.

 Indeed, Defendants do not dispute that Dr. Churg did not review the fourteen Menorah slides. We determined above that the stipulation did not require Plaintiffs to provide those slides. That situation supports a number of different inferences, including the disputed inference that Defendants never provided the slides to Dr. Churg. Our courts have long held that counsel is " 'given wide latitude to suggest inferences from the evidence,'

... even though the inferences may seem illogical or even erroneous." *Callahan v. Cardinal Glennon Hosp.*, 863 S.W.2d 852, 870 (Mo. banc 1993) (quoting *Moore v. Mo. Pac. R. Co.*, 825 S.W.2d 839, 844 (Mo. banc 1992)). If Defendants had objected at the time the argument was made, there very well could have been a different result, because the trial court had many more options available to it then. But, because Defendants did not object and bring the alleged mistake to the trial court's attention as the court had expressly requested counsel to do prior to argument, the court was left with only extreme options, which, in its discretion, the court chose not to exercise. The crux of Defendants' argument, at least to the trial court, was that Plaintiffs committed misconduct by knowingly making a false statement to the jury; this allegation was based upon their argument concerning the stipulation. Of course, even though "[t]he law indulges a liberal attitude toward argument, particularly where the comment complained of ... responds to prior argument of opposing counsel," *Kelly by Kelly v. Jackson*, 798 S.W.2d 699, 704 (Mo. banc 1990), this court will not condone knowingly false statements to a jury in closing argument. However, the trial court was not presented with anything to substantiate any such misconduct in this case. Thus, the trial court committed no error in refusing to declare a mistrial or reopen the evidence after the case had been submitted and the jury had retired for deliberations to allow Defendants to respond to the argument.

Point denied.

### Limitation on Evidence Presented in the Punitive

### Damages Phase of the Bifurcated Trial

Defendants' fourth point on appeal is essentially a continuation of their third point, or, as put by Plaintiffs, is Defen-

dants' attempt to "rehash the [slide] issue in the punitive damage phase" of the trial.

After the jury returned its verdict and just prior to the parties' argument to the jury in the second phase of the bifurcated trial, in which the jury was to determine the amount of the punitive damages award (section 510.263), Defendants continued to argue that they should be allowed to rebut Plaintiffs' closing argument concerning the slides in the first phase of the trial by presenting evidence relevant to Plaintiffs' accusation that they had hidden or withheld slides from Dr. Churg. The trial court advised Defendants that it had been the court's experience, "that the evidence in the punitive aspect of the trial is limited to the financial condition of the defendant. And that's the Court's position." The court repeatedly "told the defendants ... that if they [could] give [the court] any case law that demonstrates [evidence] other than financial condition of the defendant is admissible, [the court would] listen to it." Defense counsel provided no such case law to the trial court; rather, counsel responded, "just to make sure the record [was] clear," that he was "only addressing what [he thought was] something that would be curative of what happened in the rebuttal argument. And it can be done in the second phase right now. [He was] not saying anything about what should normally be in the second phase." Defendants explained that they were once again seeking to "solve that misinformation real easily by letting the jury know that we turned over everything to our experts that was sent to us by the plaintiffs." The trial court eventually ruled that there would "be no evidence allowed [other] than financial, pertaining to the financial condition of the defendant."

We are limited to reviewing what was before the trial court. Although Defendants' point on appeal is termed as being a complaint that the trial court erred in limiting the evidence to be presented in the second phase of the bifurcated trial to evidence relevant to Defendants' financial condition, Defendants' true complaint at trial was merely a continuing objection to Plaintiffs' final closing argument concerning the slides and their final attempt to rebut that argument. Given our previous discussion of and holding regarding Plaintiffs' final closing argument in light of the circumstances at trial, we do not feel it is necessary to discuss this issue in depth.

It is within the trial court's discretion to admit evidence, and the evidence sought to be admitted must be relevant to the issue at hand. *Keene*, 855 S.W.2d at 367 (explaining that "[t]he test for relevancy is whether an offered fact tends to prove or disprove a fact in issue or corroborates other evidence"). The evidence Defendants sought to introduce concerning who was allegedly responsible for obtaining the slides was relevant to Defendants' theory that Mr. Hoskins did not suffer from mesothelioma, an issue for the first phase of the trial. It was not relevant to T & N's failure to manufacture a safe product or warn persons of the dangers of its products—the conduct for which the jury found Defendants' liable for punitive damages in the first phase of the trial and for which it determined the amount of the punitive damages award in phase two of the trial.

The trial court did not abuse this discretion in refusing to allow Defendants to put on evidence about the stipulation and slides provided by Plaintiffs in the second phase of the bifurcated trial.

Point denied.

### Prejudgment Interest Not Allowed on Punitive Damages

In their final point on appeal before this court, Defendants challenge the trial

court's judgment for prejudgment interest. They allege the prejudgment interest is not authorized in this case under Missouri law because (1) the judgment amount did not exceed Plaintiffs' demand for payment as required to recover prejudgment interest under section 408.040.2 RSMo 2000; and (2) a prejudgment interest award on a judgment consisting solely of punitive damages does not serve the public policies on which section 408.040.2 is based. As explained below, we agree with Defendants' latter assertion, and, therefore, reverse that portion of the trial court's judgment awarding prejudgment interest on the $7 million punitive damages judgment. Because of this conclusion, Defendants' first argument becomes moot.

**A. The Prejudgment Interest Statute:** Section 408.040.2 provides:

> In tort actions, if a claimant has made a demand for payment of a claim or an offer of settlement of a claim, to the party, parties or their representatives and the amount of the judgment or order exceeds the demand for payment or offer of settlement, prejudgment interest, at the rate specified in subsection 1 of this section, shall be calculated from a date sixty days after the demand or offer was made, or from the date the demand or offer was rejected without counter offer, whichever is earlier. Any such demand or offer shall be made in writing and sent by certified mail and shall be left open for sixty days unless rejected earlier. Nothing contained herein shall limit the right of a claimant, in actions other than tort actions, to recover prejudgment interest as otherwise provided by law or contract.

**B. Standard of Review:** After the trial court allowed for a $3 million credit toward the compensatory portion of the jury's verdict due to Plaintiffs' prior settlement with Defendant BMA, section 537.060, it awarded prejudgment interest in the amount of $545,636.40 on the remaining $7 million punitive damages award. The issue is whether prejudgment interest may be awarded on the trial court's judgment for punitive damages, which requires our interpretation of section 408.040.2. This appears to be an issue of first impression in Missouri. *See Alcorn*, 50 S.W.3d at 249 n. 23 (holding that punitive damages were not submissible and therefore not deciding whether the trial court erred in allowing Alcorn to recover prejudgment interest on punitive damages).

 Statutory interpretation is a question of law, so our review is *de novo*. *Pavlica v. Dir. of Revenue*, 71 S.W.3d 186, 189 (Mo.App. W.D.2002). Our goal in interpreting section 408.040.2 is to determine the legislature's intent. *Id.* To do so, we first consider the plain and ordinary meaning of the language used in the statute. *Id.* At the same time, we must keep in mind that "[t]he legislature is presumed, in enacting a statute, to intend a logical result," so we seek to avoid an unreasonable or illogical interpretation. *Murray v. Mo. Highway & Transp. Comm'n*, 37 S.W.3d 228, 234 (Mo. banc 2001). Thus, even if the terms of the statute appear unambiguous, we can resort to rules of construction where " 'when given their ordinary meaning, [the terms] produce an illogical or absurd result in light of the statute's purpose.' " *Knob Noster Educ. Ass'n v. Knob Noster R-VIII Sch. Dist.*, 101 S.W.3d 356, 361 (Mo.App. W.D.2003) (quoting *Sisco v. Bd. of Trs. of Police Ret. Sys. of St. Louis*, 31 S.W.3d 114, 119 (Mo.App. E.D.2000)).

**C. Discussion:** Defendants argue that, as a matter of law, prejudgment interest should not be recoverable on a punitive damages judgment because Missouri's public policies behind a prejudgment inter-

est award are inconsistent with awarding prejudgment interest on punitive damages.

■■■ Upon first review of section 408.040.2's plain and ordinary terms, we note that the legislature placed no limiting terms or modifiers on the broad terms of "claim" and "judgment," so it would appear that to disallow prejudgment interest on a punitive damages judgment simply on the basis of the terms used would be contrary to the plain and ordinary terms used in the statute. But, when we consider the terms used in conjunction with the statute's purpose, we find that to allow for a prejudgment interest award on punitive damages would be an illogical or unreasonable result, which the legislature could not have intended.

Defendants cite cases from several other jurisdictions to have considered this issue and held that prejudgment interest is not available on a punitive damages award. Mr. Hoskins, on the other hand, cites no case upholding a prejudgment interest award on punitive damages, relying, instead, on the broad language of section 408.040.2. Many of the cases relied upon by Defendants are distinguishable in that the foreign jurisdiction's statutory language limits the "claim" or "judgment" for which prejudgment interest should be awarded in ways that our legislature has not so limited the terms in Missouri's prejudgment interest statute. *See, e.g., Lakin v. Watkins Associated Indus.*, 6 Cal.4th 644, 25 Cal.Rptr.2d 109, 863 P.2d 179, 191–92 (1993) (holding that "[t]he operative language of the first paragraph of section 3291 [of California's Code of Civil Procedure, which is California's prejudgment interest statute,] restricts the availability of

prejudgment interest to 'damages for personal injury,'" and punitive damages are not "damages for personal injury").

We did, however, find the case of *Belinski v. Goodman*, 139 N.J.Super. 351, 354 A.2d 92, 96 (1976) similar to the case now before us. In *Belinski*, the New Jersey Superior Court explains that in awarding prejudgment interest on the punitive damages award, the trial court "noted the absence of any express exception with regard to such damages in the otherwise broad terms of the [court] rule [mandating prejudgment interest]." *Id.*[12] The appellate court explained that "[t]he absence of such an exception was viewed [by the trial court] as indicative of the [rule-drafting] court's intent that prejudgment interest apply to punitive as well as to compensatory damages." *Id.* Noting that, "the issue projected [was] one of novel impression in New Jersey," and that "[t]he prevailing rule in other jurisdictions, however, is that 'interest is generally disallowed on punitive damages,'" the appellate court set forth the policy considerations giving rise to New Jersey's rule allowing for prejudgment interest. *Id.* (citing, *e.g., Blake v. Grant*, 65 Wash.2d 410, 397 P.2d 843, 845 (1964); 22 Am.Jur.2d *Damages* § 264 (1988) and cases cited therein). Included in these considerations was the fact that prejudgment interest is intended to compensate a plaintiff for his *loss* sustained as a result of defendant's tortious conduct, not to punish a defendant, and the fact that the rule allowing for such interest was adopted to encourage disposition or settlement of a claim as a means of calendar control. *Id.* The court then discussed the punishment and deterrent purposes of a

---

**12.** According to *Belinski*, New Jersey's Rule 4:42—11(b) provided in relevant part as follows: "Except where provided by statute with respect to a public entity or employee, the court shall, in tort actions, including products liability actions, include in the judgment interest ... on the amount of the award from the date of the institution of the action or from a date 6 months after the date of the tort, whichever is later...."

punitive damages award. *Id.* It concluded that, "in accordance with the prevailing view in other jurisdictions, [ ] prejudgment interest was not intended by [New Jersey's prejudgment interest rule] to have application to awards of punitive damages." *Id.*

■ Our supreme court has likewise explained that the two public policies served by section 408.040.2 or its purposes are to (1) "compensate[ ] claimants for the true cost of money damages they have incurred due to the delay of litigation," and (2) "where liability and damages are fairly certain, it promotes settlement and deters unfair benefit from the delay of litigation." *Brown v. Donham,* 900 S.W.2d 630, 633 (Mo. banc.1995); *see also Pollock v. Wetterau Food Distrib. Group,* 11 S.W.3d 754, 771–72 (Mo.App. E.D.1999) (exploring federal law on the issue and explaining that "[p]rejudgment interest is designed to compensate a plaintiff for the loss of use of her money from the date the cause accrued to the date of final judgment and to promote settlement, deterring a defendant from unfairly benefiting from the inherent delays of litigation."). In other words, the prejudgment interest statute seeks to make the Plaintiff whole. In contrast, "[t]he well-established purpose of punitive damages is to inflict punishment and to serve as an example and a deterrent to similar conduct." *Call v. Heard,* 925 S.W.2d 840, 849 (Mo. banc 1996); *see also Carpenter v. Chrysler Corp.,* 853 S.W.2d 346, 366 (Mo.App. E.D.1993) (explaining that "[t]he purpose of punitive damages is to punish and deter, not to compensate."). Punitive damages do not compensate the plaintiff for any loss sustained as a result of the defendant's conduct and do not reflect amounts of money that the plaintiff would have had earlier but for the delays in litigation. The focus with regard to punitive damages is on punishing the de-

fendant, not making the plaintiff whole. Accordingly, a judgment awarding prejudgment interest on punitive damages is wholly incompatible with the purposes behind prejudgment interest. To hold that by use of the broad terms of "claim" and "judgment" in section 408.040.2, our legislature intended to allow for prejudgment interest on a punitive damages award would effect an unreasonable, implausible or illogical result in light of the statute's purpose, which this court will not do. Accordingly, we reverse that portion of the trial court's judgment awarding prejudgment interest on the punitive damages award.

Point granted.

## Conclusion

The trial court did not err: in submitting Mr. Hoskins' claim for punitive damages to the jury; in refusing to declare a mistrial or reopen the evidence after the case had been submitted and the jury had retired for deliberations; or in not allowing Defendants to introduce evidence to rebut Plaintiffs' final closing argument in the second punitive damages phase of the bifurcated trial. The trial court did, however, err in awarding prejudgment interest on the punitive damages award, so that award is reversed. Thus, we affirm the trial court's judgment as modified.

ELLIS, C.J., and NEWTON, J., concur.